TERRENCE COLLINGSWORTH
(DC Bar # 471830)
International Rights Advocates
621 Maryland Ave NE
Washington, D.C. 20002
Tel: 202-543-5811
E-mail: tc@iradvocates.org

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA
_____

| | |
|---|---|
| Mohammed Forhad Mia, Individually and on behalf of Proposed Class Members, C/O 621 Maryland Ave NE, Washington, D.C. 20002; Billal, Individually and on behalf of Proposed Class Members, C/O 621 Maryland Ave NE, Washington, D.C. 20002; Jaker Hossen, Individually and on behalf of Proposed Class Members, C/O 621 Maryland Ave NE, Washington, D.C. 20002; Shuvo, Individually and on behalf of Proposed Class Members, C/O 621 Maryland Ave NE, Washington, D.C. 20002; Mia Masum, Individually and on behalf of Proposed Class Members, C/O 621 Maryland Ave NE, Washington, D.C. 20002; Mohammed Kamruzzaman, Individually and on behalf of Proposed Class Members, C/O 621 Maryland Ave NE, Washington, D.C. 20002; Mohammed Sha Alam Sarker, Individually and on behalf of Proposed Class Members, C/O 621 Maryland Ave NE, Washington, D.C. 20002; Sohel, Individually and on behalf of Proposed Class Members, C/O 621 Maryland Ave NE, Washington, D.C. 20002; Mohammed Sumon, Individually and on behalf of Proposed Class Members, C/O 621 Maryland Ave NE, Washington, D.C. 20002; Nurul Amin, Individually and on behalf of Proposed Class Members, C/O 621 Maryland Ave NE, Washington, D.C. 20002; Mohammed Habibullah Mia, Individually and on behalf of Proposed Class Members, C/O | **Case No. 22-2353**<br><br><br>**CLASS COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**<br><br><br>**JURY TRIAL DEMANDED** |

621 Maryland Ave NE, Washington, D.C.
20002; Mohammed Akhhruzzaman Sardar,
Individually and on behalf of Proposed Class
Members, C/O 621 Maryland Ave NE,
Washington, D.C. 20002; and Mohammed
Imamul Hossain, Individually and on behalf
of Proposed Class Members, C/O 621
Maryland Ave NE, Washington, D.C. 20002.

Plaintiffs,

v.

Kimberly Clark Corporation, 351 Phelps
Drive, Irving, TX 75038; and

Ansell Corporation and Ansell Healthcare
Products LLC, 111 Wood Ave, Suite 210,
Iselin, NJ 08830.

Defendants.

## NATURE OF THE COMPLAINT

1.      As is demonstrated in this Complaint, forced labor is rampant in the disposable

glove industry in Malaysia. Between September 2019 and January 2022, U.S. Customs

and Border Protection ("CBP") issued eight Withhold Release Orders ("WROs") against

Malaysian companies, six of which produce disposable gloves.[1] In 2021, CBP issued

eight total WROs worldwide, three of which were against glove makers in Malaysia.[2] In

fact, all of the glove manufacturing firms that received a WRO in 2021 were based in

Malaysia.[3] Firms in Malaysia have faced the second highest number of U.S. sanctions,

second only to China.[4] One of the firms against which CBP issued a WRO is the

Brightway Group ("Brightway"), a disposable glove manufacturer located in Malaysia.

Brightway is a major supplier of gloves to Defendants Ansell Corporation and Ansell

Healthcare Products LLC (collectively "Ansell") and Kimberly-Clark Corporation

("KCC"). Ansell and KCC have purchased gloves from Brightway for many years,

importing the goods into the United States and making an enormous profit. Ansell and

KCC have explicitly recognized the existence and perpetuation of forced labor in

Malaysian glove manufacturing firms, including in their own supply chains.[5] This

specific acknowledgement, as well as the general knowledge of forced labor in Malaysian

---

[1] https://www.cbp.gov/trade/forced-labor/withhold-release-orders-and-findings
[2] https://www.supplychaindive.com/news/us-bans-imports-malaysia-glove-supplier-brightway/616442/
[3] https://www.cbp.gov/trade/forced-labor/withhold-release-orders-and-findings
[4] https://www.reuters.com/article/us-malaysia-labour-audit-insight-idCAKCN2D0184
[5] https://www.ansell.com/-/media/projects/ansell/website/pdf/sustainability/ansell-sustainability-report-2021.ashx; https://www.kimberly-clark.com/-/media/kimberly/pdf/sustainability-reports/2019/kc-2019-sustainability-report.pdf

1

firms, confirms that Ansell and KCC knew, or should have known, about forced labor in their disposable gloves supply chains. Therefore, the Defendants have knowingly profited from the forced labor of individuals manufacturing and producing disposable gloves at Brightway, one of their key suppliers. Ansell and KCC have attempted to maintain their public reputation despite such usage of forced labor, each publishing statements regarding their dedication to addressing and ending modern slavery. However, these statements, and accompanying company policies, are verbal measures to save the companies' reputations, rather than actually addressing or resolving the known forced labor in their supply chains. Words without action mean nothing, and absolutely do not resolve either company of legal or moral responsibility. The companies' policies have managed to mislead consumers but did nothing to remediate the forced labor in their supply chains. In fact, the statements prove the companies' knowledge of the forced labor, and recognition of their accountability. This practice of issuing "policies" and strong statements against forced labor and then doing little or nothing to implement the policies or remediate the harm suffered by those subjected to forced labor is a disturbing trend by multinational companies, including Ansell and KCC.

2.      The thirteen plaintiffs, Mohammed Forhad Mia, Billal, Jaker Hossen, Shuvo, Mia Masum, Mohammed Kamruzzaman, Mohammed Sha Alam Sarker, Sohel, Mohammed Sumon, Nurul Amin, Mohammed Habibullah Mia, Mohammed Akhhruzzaman Sardar, and Mohammed Imamul Hossain (collectively referred to herein as the "Former Forced Laborers") are all former forced laborers of Bangladeshi origin who were subject to forced labor in one of Brightway's factories in Malaysia. Brightway's factories supply disposable gloves to the Defendant companies named herein. All of the plaintiffs paid

high recruitment fees; were forced to work 12+ hour days often with restricted access to food, water, and restrooms; were physically and/or verbally abused; received delayed or incomplete compensation; resided in overcrowded and unclean accommodations; had their passports seized by Brightway; and noted restricted ability to leave the facilities. Several of them were threatened by management and punished for protesting working conditions. They all endured the specific conditions found by CBP to constitute "forced labor" in the Brightway-specific WROs. The Former Forced Laborers bring this action on behalf of themselves, and all other similarly situated former forced laborers, against Defendants Ansell and KCC for the forced labor they endured because of the wrongful conduct caused and aided and abetted by these corporate entities. Specifically, the Former Forced Laborers assert claims for trafficking and forced labor in violation of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595 *et seq*. Plaintiffs also seek relief based on common law claims of negligent supervision, intentional infliction of emotional distress, and unjust enrichment.

**3.**      The Former Forced Laborers bring their claims in the United States because such claims cannot be maintained in their home country of Bangladesh. There is no law in Bangladesh whereby such Plaintiffs can seek civil damages for their injuries against the major glove manufacturing and distribution firms operating outside of the country. Nor could claims be brought in Malaysia as the judicial system is notoriously corrupt and would be unresponsive to the claims of foreign workers against major manufacturing firms operating in and bringing significant revenue to Malaysia. It is also likely that both Plaintiffs and their attorneys would be placed in danger due to the threats by members of the Brightway management group and general hostility by the company. Indeed, several

of the Plaintiffs have suffered serious threats of violent retaliation after they were accused by Brightway of being whistleblowers. In addition, the U.S. corporate Defendants are unlikely to submit to personal jurisdiction in either Bangladesh or Malaysia. Further, the Former Forced Laborers bring their claims in the United States, as the U.S. has provided a forum for such human rights lawsuits with the passage of TVPRA, which specifically provides for extraterritorial jurisdiction. *See* 18 U.S.C. § 1596.

4.      The Former Forced Laborers have concerns about whether they will face retaliation against themselves and their families by those persons who trafficked them into Malaysia, the BioPro management team, and members of the greater Brightway organization. Plaintiffs' case not only threatens to expose criminalized elements within the glove manufacturing sector, but to dismantle the source of its significant profits: cheap labor through forced human trafficking. However, these thirteen Plaintiffs hope that by speaking out publicly about the horrors they endured, they can better educate the public, consumers, and government regulators so they can directly work to end these abhorrent practices.

## I.      <u>JURISDICTION AND VENUE</u>

5.      The primary claim in this case is brought under the TVPRA, 18 U.S.C. § 1595 *et. seq*, for violations of 18 U.S.C. § 1589 and 1590. The offenders are nationals of the United States or present in the United States, irrespective of nationality, providing this Court with federal question jurisdiction pursuant to 28 U.S.C. § 1331. 18 U.S.C. § 1596

specifically grants U.S. courts extraterritorial jurisdiction for Plaintiffs' TVPRA claims, all of which accrued after December 23, 2008, the effective date of § 1596.[6]

6.    Plaintiffs' state law claims arise out of the same case or controversy as their federal claims and involve a common nucleus of operative facts. All injuries Plaintiffs suffered were a result of their being trafficked and subjected to harsh conditions performing forced labor. Thus, this Court also has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

7.    This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) based on diversity of citizenship. All Plaintiffs are foreign nationals and citizens of Bangladesh, and each of their claims for damages exceeds $75,000. All Defendants have headquarters in the United States and thus, are citizens of the United States.[7]

8.    This Court has personal jurisdiction over Defendants Ansell Corp., Ansell Healthcare Products LLC, and KCC because they are all U.S. citizen companies, and they do substantial and continuous business within the District of Columbia. The long arm statute of the District of Columbia, D.C. Code § 13-423(a)(1), uses the same standard as the due process clause of the Constitution, where there are "minimum contacts." "Section (a)(1)'s 'transacting any business' clause generally has been interpreted to be coextensive with the Constitution's due process requirements and thus to merge into a single inquiry." *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000). "[The] 'transacting any business' clause has been interpreted to provide jurisdiction to the full extent allowed by the Due Process Clause. Therefore, the 'statutory and

---

[6] *See Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184 (5th Cir. 2017), cert. denied, No. 16-1461, 2017 WL 2463601 (U.S. Oct. 2, 2017).
[7] *See Hertz Corp. v. Friend*, 559 U.S. 77, 80-81 (2010) (stating that a corporation will typically be a citizen of any state in which it has headquarters)

constitutional jurisdiction questions, which are usually distinct, merge into a single inquiry here.'" *United States v. Ferrara*, 54 F.3d 825, 828 (D.C. Cir. 1995). *See also Toumazou v. Turkish Republic of Northern Cyprus*, 71 F.Supp.3d 7, 15-16 (D.D.C. 2014) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474-75 (the "transacting business" requirement of D.C. Code § 13-423(a)(1) requires that a defendant "purposefully avail[ed] itself of the privilege of conducting business within the forum state and that it has established minimum contacts in the forum state so that it should reasonably anticipate being hailed into court there.'") Ansell and KCC conducted significant business in the District of Columbia, including selling here their disposable latex gloves that were produced with trafficked and forced labor that is at issue in this case. These sales within the District satisfy the "doing business" requirement and also exceeds the "minimum contacts" required for this Court to exercise personal jurisdiction over them.

**9.**     Venue over the two Defendants is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(3) and (c)(2). Based on subsection (b)(3), venue is proper because there is no single judicial district where the Defendants are headquartered, and this judicial district is one where all Defendants are subject to personal jurisdiction. Further, based on subjection (c)(2), Defendants are deemed to reside in this judicial district because they are all subject to personal jurisdiction in this district.

## II.     PARTIES

### A.  Former Forced Laborers

**10.**     Plaintiff Billal is an adult citizen of Bangladesh currently residing in Cumilla, Bangladesh. He brings this action on behalf of himself and all other current or former

forced laborers trafficked into Malaysia from Bangladesh and then forced to perform labor in a glove manufacturing company owned or controlled by Brightway that provides goods to one or more of the Defendants named herein.

11.    Plaintiff Md. Forhad Mia is an adult citizen of Chandpur, Bangladesh, but is currently residing in Malaysia. He brings this action on behalf of himself and all other current or former forced laborers trafficked into Malaysia from Bangladesh and then forced to perform labor in a glove manufacturing company owned or controlled by Brightway that provides goods to one or more of the Defendants named herein.

12.    Plaintiff Jaker Hossen is an adult citizen of Noakhali, Bangladesh, but is currently residing in Malaysia. He brings this action on behalf of himself and all other current or former forced laborers trafficked into Malaysia from Bangladesh and then forced to perform labor in a glove manufacturing company owned or controlled by Brightway that provides goods to one or more of the Defendants named herein.

13.    Plaintiff Shuvo is an adult citizen of Bangladesh currently residing in Narayanganj, Bangladesh. He brings this action on behalf of himself and all other current or former forced laborers trafficked into Malaysia from Bangladesh and then forced to perform labor in a glove manufacturing company owned or controlled by Brightway that provides goods to one or more of the Defendants named herein.

14.    Plaintiff Mia Masum is an adult citizen of Bangladesh currently residing in Bajitpur, Bangladesh. He brings this action on behalf of himself and all other current or former forced laborers trafficked into Malaysia from Bangladesh and then forced to perform labor in a glove manufacturing company owned or controlled by Brightway that provides goods to one or more of the Defendants named herein.

15.     Plaintiff Md. Kamruzzaman is an adult citizen of Raipur, Bangladesh, but is currently residing in Malaysia. He brings this action on behalf of himself and all other current or former forced laborers trafficked into Malaysia from Bangladesh and then forced to perform labor in a glove manufacturing company owned or controlled by Brightway that provides goods to one or more of the Defendants named herein.

16.     Plaintiff Sohel is an adult citizen of Bangladesh currently residing in Chandpur, Bangladesh. He brings this action on behalf of himself and all other current or former forced laborers trafficked into Malaysia from Bangladesh and then forced to perform labor in a glove manufacturing company owned or controlled by Brightway that provides goods to one or more of the Defendants named herein.

17.     Plaintiff Md. Sha Alam Sarker is an adult citizen of Gaibandha, Bangladesh, but is currently residing in Malaysia. He brings this action on behalf of himself and all other current or former forced laborers trafficked into Malaysia from Bangladesh and then forced to perform labor in a glove manufacturing company owned or controlled by Brightway that provides goods to one or more of the Defendants named herein.

18.     Plaintiff Mohammad Sumon is an adult citizen of Noakhali, Bangladesh, but is currently residing in Malaysia. He brings this action on behalf of himself and all other current or former forced laborers trafficked into Malaysia from Bangladesh and then forced to perform labor in a glove manufacturing company owned or controlled by Brightway that provides goods to one or more of the Defendants named herein.

19.     Plaintiff Nurul Amin is an adult citizen of Brahmanbaria, Bangladesh. He brings this action on behalf of himself and all other current or former forced laborers trafficked into Malaysia from Bangladesh and then forced to perform labor in a glove

manufacturing company owned or controlled by Brightway that provides goods to one or more of the Defendants named herein.

**20.**     Plaintiff Md. Habibullah Mia is an adult citizen of Narsingdi, Bangladesh, but is currently residing in Malaysia. He brings this action on behalf of himself and all other current or former forced laborers trafficked into Malaysia from Bangladesh and then forced to perform labor in a glove manufacturing company owned or controlled by Brightway that provides goods to one or more of the Defendants named herein.

**21.**     Plaintiff Md. Akhhruzzaman Sardar is an adult citizen of Faridpur, Bangladesh, but is currently residing in Malaysia. He brings this action on behalf of himself and all other current or former forced laborers trafficked into Malaysia from Bangladesh and then forced to perform labor in a glove manufacturing company owned or controlled by Brightway that provides goods to one or more of the Defendants named herein.

**22.**     Plaintiff Md. Imamul Hossain is an adult citizen of Bangladesh but is currently residing in Malaysia. He brings this action on behalf of himself and all other current or former forced laborers trafficked into Malaysia from Bangladesh and then forced to perform labor in a glove manufacturing company owned or controlled by Brightway that provides goods to one or more of the Defendants named herein.

**B.**   **Former Forced Laborers Plaintiffs' Class Action Allegations**

**23.**     The Former Forced Laborers Plaintiffs bring this action individually, and pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), on behalf of the following class:

> All current or former forced laborers trafficked into Malaysia from Bangladesh from September 1, 2012 to the present under the same conditions as were found by the U.S. CBP to be systematic trafficking and then forced to perform labor in a glove manufacturing company owned or controlled by Brightway and supplying gloves to Ansell and/or KCC.

**24.** The class is so numerous that joinder of all members is impractical. Based on extensive research done on human trafficking and forced labor in Malaysia, there is uniform agreement that there are thousands of former and current forced laborers that would qualify as class members.

**25.** There are questions of law and fact common to the class. Key common questions include, but are not limited to, the following:

    a. Whether Plaintiffs and Proposed Class Members were victims of the same systematic practices identified in the U.S. CBP WRO specific to Brightway as trafficking and unlawful forced labor in violation of International Labor Convention 29, while working in a Brightway glove manufacturing firm which supplied goods to the named Defendants Ansell and KCC?

    b. Whether Defendants were members of a venture that caused and/or aided and abetted the trafficking of Plaintiffs and Proposed Class Members and then forced them to perform involuntary labor by either providing logistical support to the supplier firms and/or failing to provide sufficient logistical support and/or take adequate action to prevent and stop such forced labor in violation of international law, federal, and state law?

    c. Whether injunctive relief can be fashioned to prevent further trafficking and forced labor in the glove manufacturing facilities supplying goods to Defendants KCC and Ansell?

**26.** The Plaintiffs' claims are typical of the claims of the class. They seek redress for the same conduct that has affected all class members and press legal claims which are the same for all class members.

10

27.     The Plaintiffs named herein will fairly and adequately represent the class. These Plaintiffs do not have conflicts of interest with members of the class and have retained counsel who are experienced in complex litigation, including class actions and international litigation, and who will vigorously prosecute this action.

28.     A class action is the superior method for adjudication of this controversy. In the absence of a class action, courts will be unnecessarily burdened with multiple, duplicative individual actions. Moreover, if a class is not certified, many meritorious claims will go unaddressed as the individual class members are not able to prosecute complex litigation against large defendant corporations.

### C. Disposable Glove Importer Defendants

29.     The parent company Ansell is one of the world's largest manufacturers and distributors of disposable industrial and medical gloves with over 14,000 employees in 58 countries. Ansell is an Australian public company that has 4 corporate headquarters in Melbourne, Australia; Brussels, Belgium; Cyberjaya, Malaysia; and New Jersey, United States. The company employs 582 people and has headquarters, offices, warehouses, and distribution centers across the United States. The company has developed a Supplier Management Framework to address and govern risks in its supply chain and publishes an annual sustainability report. Ansell engages with its suppliers through audits, direct engagement, business and industry associations, supplier agreements, and supplier Code of Conduct to regulate its supply chain. The company's Board of Directors meets frequently, including 19 times during 2021, and reviews audits, risk management, and sustainability governance. The company has acknowledged that it operates in an industry and in countries where there is a high risk of forced labor, and that it has a "legal duty to

comply with all laws, including those relating to workers' rights."[8]  Many of the
company's decisions and policies come from the United States. Among its sources of
latex gloves, Ansell has a direct purchasing agreement Brightway. Until CBP issued a
WRO against Brightway in December 2021, Ansell, through its agent in the U.S.
Defendant Ansell Healthcare Products LLC, sold Brightway gloves across the United
States, including in Washington, D.C. Ansell has been prohibited from importing
Brightway gloves following the CBP's WRO, but the companies remain in a business
contract.

**30.**      Defendant KCC is an American personal care company that produces sanitary
paper products. Its brands include Huggies, Kleenex, Kotex, Cottonelle, Scott, Pull-Ups,
and Depend. The company is incorporated in Delaware and headquartered in Dallas,
Texas. KCC has approximately 46,000 employees across 34 countries. In 2020, the
company earned $19.1 billion in net sales, with a net income of $2.7 million. The same
year, 54% of the company's net sales were generated in North America. KCC is an
American public company that primarily governs out of the United States. Like Ansell,
KCC has a direct contract with and purchases latex gloves from Brightway. KCC sold
Brightway latex gloves in the U.S. market for years until CBP issued a WRO against
Brightway. The WRO has forced KCC to temporarily pause imports from Brightway to
the U.S. market, including in Washington, D.C., but the companies remain in a legal
business contract and may still be doing business in other parts of the world.

---

[8] https://www.ansell.com/-/media/projects/ansell/website/pdf/sustainability/ansell-sustainability-
report-2021.ashx

### III.    FACTUAL ALLEGATIONS

**A. Forced labor in disposable glove manufacturing firms in Malaysia is well-documented by highly credible sources.**

**31.**       Human trafficking is a massive and growing scourge around the world. The United States government estimates that there are currently more than 24 million victims of human trafficking.[9] Human traffickers often prey on the most vulnerable members of society. In its 2022 Trafficking in Persons Report, the U.S. Department of State notes that "Bangladesh is the world's sixth largest migrant-sending country," and traffickers frequently exploit individuals who willingly migrate for work into forced labor.[10] As was the case with the Plaintiffs herein, traffickers often deceive and coerce individuals through promises of jobs that are substantially different from what was promised.[11] Victims are often lured with false promises of good pay and better lives, and then are instead forced to work under terrible and coercive conditions.[12] Here, the Plaintiffs were forced to remain in horrible employment through a classic trafficking and forced labor system of debt bondage, isolation, seizure of passports, and abuse. United States law prohibits and criminalizes debt bondage, which may include "withholding earnings or forcing the victim to assume debts for expenses like food, housing, or transportation."[13] The Plaintiffs were forced into debt bondage during their time at Brightway, which is a form of forced labor. The U.S. Department of State has found that in Bangladesh,

---

[9] https://www.state.gov/humantrafficking-about-human-trafficking/
[10] https://www.state.gov/wp-content/uploads/2022/04/337308-2022-TIP-REPORT-inaccessible.pdf
[11] U.S. Dep't of State, Trafficking in Persons Report 27 (2011).
[12] U.S. Dep't of Justice, Attorney General's Annual Report to Congress and Assessment of U.S. Government Activities to Combat Trafficking in Persons, Fiscal Year 2012 1 (2014).
[13] https://www.state.gov/what-is-trafficking-in-persons/

"[t]raffickers often used debt-based coercion to compel workers into labor, exploiting an initial debt assumed by a worker as part of the employment terms."[14] Further, the Department of State has recognized that "human trafficking can take place even if the victim initially consented to providing labor."[15] Thus, the Plaintiffs have clearly been the victims of trafficking and forced labor by the definitions and prohibitions set forth by the United States government.

32.     In order to combat trafficking, the United States became a party to the United Nations' Protocol to Prevent, Suppress, and Punish Trafficking in Persons, along with 163 nations. In addition, Congress enacted and repeatedly reauthorized the TVPRA.

33.     The widespread use of forced labor in global supply chains has led the United States to create specific measures to identify and address goods produced by forced labor. The United States Custom and Border Protection ("CBP"), the largest federal law enforcement agency of the United States Department of Homeland Security, is charged with "ensuring the goods that enter the U.S. marketplace are genuine, safe, and lawfully sourced."[16] Section 307 of the Tariff Act of 1930 (19 U.S.C. § 1307) "prohibits importing any product that was mined, produced, or manufactured wholly or in part by forced labor."[17] CBP enforces Section 307 by issuing Withhold Release Orders ("WRO") and Findings against groups that attempt to import unethically sourced goods. To issue a WRO against a company, CBP must find "reasonable evidence of the use of forced labor

---

[14] https://www.state.gov/wp-content/uploads/2022/04/337308-2022-TIP-REPORT-inaccessible.pdf
[15] https://www.state.gov/what-is-trafficking-in-persons/
[16] https://www.cbp.gov/trade/basic-import-export?language_content_entity=en
[17] https://crsreports.congress.gov/product/pdf/IF/IF11360

14

in the manufacturing or production of a good or goods entering the U.S. supply chain."[18]
To issue a finding, CBP must have conclusive evidence of forced labor.[19]

34.     CBP does not issue WROs or findings lightly; there are several steps that must be
taken before CBP even opens an investigation. To start the process, an individual must
file an allegation including "(1) a full statement of the reasons for the belief; (2) a
detailed description or sample of the merchandise; and (3) all pertinent facts obtainable as
to the production of the merchandise abroad."[20] If, following an investigation, CBP issues
a WRO or Finding against a company, the agency detains any goods sourced from that
company attempted to be imported into the United States. To reclaim possession of the
goods, the importers of the detained shipment can export the goods or demonstrate the
goods were not produced with forced labor.[21]

35.     To determine whether a good is produced or manufactured by forced labor, CBP
investigates whether the production and manufacturing processes present any indicators
of forced labor, as determined by the International Labor Organization ("ILO"). ILO
provides eleven indicators of forced labor, all of which are common signs of forced labor.
The indicators are as follows: abuse of vulnerability, deception, restriction of movement,
isolation, physical and sexual violence, intimidation and threats, retention of identity
documents, withholding of wages, debt bondage, abusive working and living conditions,
and excessive overtime.[22]

---

[18] https://www.cbp.gov/trade/forced-labor/withhold-release-orders-and-findings
[19] https://www.cbp.gov/trade/forced-labor/withhold-release-orders-and-findings
[20] https://www.cbp.gov/trade/programs-administration/forced-labor/frequently-asked-questions
[21] https://www.cbp.gov/newsroom/national-media-release/cbp-issues-withhold-release-order-brightway-group
[22] https://www.ilo.org/wcmsp5/groups/public/---ed_norm/---declaration/documents/publication/wcms_203832.pdf

36.     Between September 2019 and January 2022, CBP issued eight WROs for

Malaysian companies, six companies of which produce disposable gloves.[23] The

remaining two companies manufacture or produce palm oil and palm oil products. These

WROs were published and widely available to the public. Further, notice of the WROs

was heavily circulated and publicized as personal protective equipment was in high

demand during the COVID-19 pandemic. Companies in Malaysia have faced the second

highest U.S. sanctions over forced labor allegations, second only after China.[24] Amongst

the eight WROs issued for Malaysian companies between September 2019 and January

2022 was one against the Brightway Group, which includes Brightway Holdings,

Laglove, and BioPro.[25] The WRO against Brightway was issued on December 20, 2021

and remains active.[26] Thus, if any individual or company attempts to import Brightway

gloves into the United States, CBP will detain the goods unless importers can prove the

absence of forced labor at Brightway.[27] As Brightway has failed to redress the use of

forced labor in its facilities, Brightway does not currently have access to the U.S. market.

37.     The Trafficking Victims Protection Act ("TVPRA") requires the Secretary of

State to provide Congress a list of countries that demand scrutiny in terms of forced

labor. In 2021, Malaysia was included on the list as a Tier 3 country: "countries and

territories whose governments do not fully comply with the minimum standards and are

not making significant efforts to do so." Tier 3 is the lowest possible rank and

---

[23] https://www.cbp.gov/trade/forced-labor/withhold-release-orders-and-findings
[24] https://www.reuters.com/world/asia-pacific/an-audit-gave-all-clear-others-alleged-slavery-2021-05-19/
[25] https://www.cbp.gov/trade/forced-labor/withhold-release-orders-and-findings
[26] https://www.cbp.gov/trade/forced-labor/withhold-release-orders-and-findings
[27] https://www.cbp.gov/trade/forced-labor/withhold-release-orders-and-findings

demonstrates the prevalence of forced labor in the country without effective resolution from the country's government.[28]

38.    The United States has increased enforcement of forced labor laws over the past several years.[29] Environmental, social, and governance is becoming increasingly popular, and consumers are more attentive to the ethical sourcing of their purchases. Many companies now publish annual Sustainability and Modern Slavery statements. Mainstream media sources including Reuters, Associated Press, The Atlantic, Bloomberg, ABC News, CNBC, and CNN have reported on forced labor in Malaysian manufacturing firms.

39.    The Atlantic published an exposé regarding the use of forced labor in the electronics industry, which is rooted in and dependent on Malaysian manufacturing firms.[30] It is estimated that migrant workers make up to one quarter of the Malaysian electronics industry workforce.[31] Based on a study produced by watchdog organization Verité, one-third of migrant workers reported they were being forced to work against their will.[32] The article notes that 92% of foreign workers paid recruitment fees to get

---

[28] https://www.state.gov/report-to-congress-on-2021-trafficking-in-persons-interim-assessment-pursuant-to-the-trafficking-victims-protection-act/

[29] https://www.supplychaindive.com/news/us-bans-imports-malaysia-glove-supplier-brightway/616442/

[30] https://www.theatlantic.com/business/archive/2018/06/malaysia-forced-labor-electronics/563873/

[31] https://www.theatlantic.com/business/archive/2018/06/malaysia-forced-labor-electronics/563873/

[32] https://www.theatlantic.com/business/archive/2018/06/malaysia-forced-labor-electronics/563873/

their job in Malaysia, often which put their family into significant debt.[33] Workers also shared their experiences of terrible living conditions with the author.[34]

40.    The prevalence of forced labor in Malaysia and specifically, in the disposable glove industry, is widespread and well-known. The United States Department of State continuously recognizes the abysmal presence of forced labor in Malaysia, including in the rubber-product industry, and the insufficient steps the Malaysian government has taken to address the violations.[35] In the United States, the CBP has taken repetitive, direct action against several Malaysian manufacturing firms, and the media has documented the human rights violations on which CBP's WROs and Findings are based. In addition, Migrant Worker Specialist Andy Hall sent numerous and detailed reports to KCC and Ansel senior managers reporting systematic trafficking and forced labor in their supply chains, particularly at Brightway. He also regularly informed them that their so-called audits performed by outside auditors at the Brightway facilities were not accurate due to prior notice and superficial changes made by Brightway for the purpose of misleading the auditors. It thus impossible for Defendants KCC and Ansell, two major international corporations which undoubtably pay close attention to American import and export policies, as well as related media, and as direct recipients of specific warnings from Mr. Hall and no doubt others, have not been aware of the well-documented forced labor in their latex glove supply chains in Malaysia.

---

[33] https://www.theatlantic.com/business/archive/2018/06/malaysia-forced-labor-electronics/563873/
[34] https://www.theatlantic.com/business/archive/2018/06/malaysia-forced-labor-electronics/563873/
[35] https://www.state.gov/wp-content/uploads/2022/04/337308-2022-TIP-REPORT-inaccessible.pdf

**B.** **Foreign worker recruitment practices are plagued with corruption and allow for the rampant abuse of workers, including the Plaintiffs.**

41.     It is well-documented that foreign worker recruitment practices, specifically in Asia and the Middle East, are deeply corrupt. Foreign workers are often recruited by manpower agencies, to whom they are forced to pay high recruitment fees to secure a job and work visa in another country. While the manpower agencies and employers receive kickbacks from this system, all of the costs are paid by foreign workers.[36] The International Labor Convention has declared that workers should not pay recruitment fees or costs, but the standard is rarely heeded.[37] The harmful recruitment practices most often effect and are detrimental to low-skilled, low-income migrant workers, similar to the Plaintiffs.[38]

42.     Illegal "visa trading" is particularly excessive and currently uncontrolled in Malaysia and Bangladesh. "Visa trading" occurs when middlemen purchase visas from employers and sell them to recruitment agencies, which then charge foreign workers astronomical recruitment fees for the visa and to secure them a position at the employer. The practice is illegal but abundant. It is also a root cause of high migration costs, debt bondage, and forced labor. One source found that in 2016, "an estimated $2.1 billion was

---

[36] Jureidini, R. (2017) 'Transnational Culture of Corruption in Migrant Labour Recruitment', in McAuliffe, M. and M. Klein Solomon (Conveners) (2017) *Ideas to Inform International Cooperation on Safe, Orderly and Regular Migration*, IOM: Geneva.
[37] Jureidini, R. (2017) 'Transnational Culture of Corruption in Migrant Labour Recruitment', in McAuliffe, M. and M. Klein Solomon (Conveners) (2017) *Ideas to Inform International Cooperation on Safe, Orderly and Regular Migration*, IOM: Geneva.
[38] Jureidini, R. (2017) 'Transnational Culture of Corruption in Migrant Labour Recruitment', in McAuliffe, M. and M. Klein Solomon (Conveners) (2017) *Ideas to Inform International Cooperation on Safe, Orderly and Regular Migration*, IOM: Geneva.

laundered out of Bangladesh for illegal purchases of work visas."[39] Many of these work visas went to Bangladeshi workers seeking employment in Malaysia. Although workers pay high recruitment fees to obtain these visas, the visas are supposed to be free. This system of corruption often places workers into a system of debt bondage and consequently, forced labor to pay off their debt.

43.    Bangladesh has pledged to stop "visa trading," but so far, there has been no visible progress.[40] Furthermore, there has been little to no action to reimburse workers for the recruitment fees they have paid, even if companies, like the Defendants, have promised to do so. High recruitment costs, "visa trading," and other recruitment antics leave migrant workers in crippling debt and located in a foreign country, doing work that may be drastically different than what was promised. It creates a hurricane of human rights and labor violations with workers likely unable to advocate for themselves. It is necessary to recognize the relationship between the recruitment agencies and employers, as both parties are equally guilty in brewing such a storm.

**C.  <u>Defendants and other major disposable glove companies knowingly profit from and benefit from the use of trafficked and forced labor.</u>**

44.    Defendants Ansell and KCC are massive entities with designated teams charged with finding and addressing the numerous public reports confirming the widespread use of forced labor schemes in the Malaysian glove industry. These same teams at Ansell and KCC were also tasked with assessing the extent of the use of trafficked and forced labor in their respective companies' supply chain. In fact, each of the companies has published

---

[39] https://www.tbsnews.net/bangladesh/migration/illegal-visa-trading-augments-migrants-woes-443910
[40] https://www.tbsnews.net/bangladesh/migration/illegal-visa-trading-augments-migrants-woes-443910

external sustainability reports and modern slavery statements, acknowledging the risks and existence of forced labor in their respective supply chains. Both companies have direct contractual relationships with Brightway; until the CBP's WRO, Ansell and KCC imported gloves manufactured by Brightway and made enormous profits by distributing the gloves in the United States. Furthermore, as noted, each company has specific employees charged with researching, monitoring, and supposedly addressing the presence of trafficking and forced labor in its operations and supply chains. 18 U.S.C. § 1595 provides a civil remedy for victims of trafficking and forced labor against anyone who "knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter." Thus, it is wholly sufficient that Ansell and KCC knowingly profited and benefitted from the trafficking and forced labor of the Plaintiffs, even if the companies were not the direct participants in the wrongful acts.

**45.**   The United States government defines human trafficking as "the use of force, fraud, or coercion to obtain some type of labor or commercial sex act."[41] Human traffickers frequently look for vulnerable individuals who are struggling with economic hardship, lack of social relationships, political instability, or psychological challenges.[42] All of the Plaintiffs joined Brightway because of the promise of a high-paying job that would enable them to provide for themselves and/or their financially dependent families. The Plaintiffs also report being coerced into taking the job through false depictions of the company. The agencies to whom the Plaintiffs paid high recruitment fees and that were

---

[41] https://www.dhs.gov/blue-campaign/what-human-trafficking
[42] https://www.dhs.gov/blue-campaign/what-human-trafficking

recruitment agents for Brightway shared only the good parts of Brightway and lied about the realities the Plaintiffs would encounter. It's necessary to note that "[e]ven if victims initially offer consent, that consent is rendered meaningless by the actions of the traffickers to exploit them for labor."[43] Based on these definitions, as provided by the United States government, all of the Plaintiffs were victims of human trafficking by Brightway to the benefit of Ansell and KCC.

46.    Forced labor "occurs when individuals are compelled against their will to provide work or service through the use of force, fraud, or coercion."[44] There are many forms of forced labor– the United States government explicitly notes that a circumstance in which an individual falls into debt "during the recruitment process, compounded by an employer who takes unexpected deductions from their pay" is an indicator of forced labor.[45] Additional indicators include monitored interactions with others, overcrowded and inhumane accommodations, and physical isolation. All these signs were, and still are, present at Brightway's BioPro facility, where the Plaintiffs lived and worked. Furthermore, the high recruitment fees that the Plaintiffs paid to third party agencies, with whom Brightway had established connections, and Brightway's pattern of deducting pay without justification, placed the Plaintiffs in a system of debt bondage. Brightway intentionally held the Plaintiffs in an institution of forced labor because it was the easiest way for the company to engage in mass production at the lowest price. Forced laborers are a prime source of cheap labor, and the system worked to the direct benefit of Brightway, Ansell, and KCC. Shortly before this complaint was filed, Plaintiffs were

---

[43] https://www.acf.hhs.gov/otip/fact-sheet/resource/fshumantrafficking
[44] https://www.dhs.gov/blue-campaign/forced-labor
[45] https://www.dhs.gov/blue-campaign/forced-labor

reimbursed their recruitment fees by Brightway as part of a "program" to address the issues in the CBP findings, but this does not change that until then the recruitment fees were part of a system of debt bondage all Plaintiffs endured from the very start of their employment, nor does it change that the other aspects of Brightway's debt bondage system continue, including massive and unjustified deductions for food, lodging and penalties. Further, neither Brightway, KCC or Ansell has done anything to address or remediate the suffering Plaintiffs and the class members endured while being trafficked and forced to work at Brightway. Subjecting a person to forced labor is a crime around the world precisely because this form of modern slavery is a serious human rights violation that causes great suffering and distress in the person who is forced against their will to perform labor under brutal conditions. All of the Plaintiffs and class members suffered grave injuries as a result of being subjected to forced labor at Brightway.

47.     Defendants KCC and Ansell, with their business dependent on the gloves manufactured at Brightway facilities in Malaysia, are intimately aware of the operations at Brightway. The companies know of the risks of trafficking and forced labor in their supply chains, as evidenced by their reports on sustainability and forced labor. Additionally, the Defendants were directly aware of the human rights violations perpetrated by Brightway, a main supplier of theirs, as evident by their corporate publications and responses to CBP's WRO against Brightway.

48.     All of the Plaintiffs worked at BioPro, one of Brightway's subsidiaries and factories in Malaysia, when Ansell and KCC purchased gloves from Brightway. Each Plaintiff began working at BioPro between January 2017 and December 2018. Ansell and KCC only stopped purchasing gloves from Brightway in December 2021, when CBP

issued a WRO against Brightway. Thus, Ansell and KCC directly purchased gloves from Brightway while the Plaintiffs were trafficked and held as forced laborers by Brightway.

49.     Following CBP's WRO against Brightway, Ansell directly acknowledged its relationship with Brightway, and the presence of forced labor in its supply chain. Ansell publicly halted orders from Brightway after CBP filed a WRO against Brightway, confirming the supplier-buyer relationship between the companies. Further, in Ansell's response to the CBP order, the company confirmed that "it was aware of non-compliance at the Brightway facilities through its third-party audits."[46] Ansell conducted third-party audits prior to CBP's investigation into Brightway, confirming that Ansell knew about the violations prior to the WRO, but failed to halt imports until forced to do so by CBP.[47] This series of actions and statements serve as Ansell's confession that the company knowingly profited and benefitted from trafficking and forced labor through its relationship with Brightway.

50.     Ansell, in its 2021 Sustainability Report, again directly confesses the presence of labor and human rights violations in its supply chain. The company writes that there "*continue to be concerning incidents involving our supply chain* and our industry more broadly."[48] (emphasis added) There is no room for misinterpretation in this statement–Ansell not only recognizes the presence of trafficking and forced labor in the glove manufacturing industry, but in its own supply chain. Furthermore, as the company uses the term "continue," it is admitting to knowing of violations for some time before the

---

[46] https://www.reuters.com/article/malaysia-brightway-orders/ansell-halts-orders-from-malaysian-glove-maker-brightway-after-us-ban-idUKL1N2TD0E1
[47] https://www.reuters.com/world/asia-pacific/an-audit-gave-all-clear-others-alleged-slavery-2021-05-19/
[48] Ansell Sustainability Report 2021

publication was released in 2021. The company also confirms that it has seen the widespread reports regarding forced labor and modern slavery, stating "[c]oncerning reports have emerged in the media regarding the treatment of workers in *our industry and supply chain*, including allegations of forced labour."[49] (emphasis added) These statements specifically confirm that Ansell not only should have known, but did know that it benefitted from participation in a venture that involved forced labor. These direct acknowledgements of human rights and labor violations in its supply chain are admissions of guilt on behalf of Ansell. The company knowingly benefitted and profited from trafficking and forced labor and is on record confirming such. Consumers and regulators should not mistake these admissions as signs of good corporate citizenship; Ansell was merely following the traditional corporate playbook and claiming to be against forced labor while continuing to profit from it and doing nothing to stop it.

51.     Likewise, although KCC has created specific teams to investigate and report on human rights violations within the company's supply chain, the company has failed to transform the knowledge it has accumulated into action. KCC has a Supply Chain Human Rights team that has identified risks within the company's supply chain, including forced labor, discrimination and harassment, wages and benefits, occupational health and safety, and access to water and sanitation.[50] The company conducts third-party audits at 150 supplier facilities annually, including at manufacturing firms in 34 countries.[51] In its 2019 Sustainability Report, KCC notes that 84% of its audited suppliers demonstrated

---

[49] Ansell Sustainability Report 2021
[50] https://www.kimberly-clark.com/-/media/kimberly/pdf/slavery-and-human-trafficing/modern-slavery-statement-uk-board---26-july-2021-signed-kt.pdf?la=en-us
[51] https://www.kimberly-clark.com/-/media/kimberly/pdf/sustainability-reports/2019/kc-2019-sustainability-report.pdf

compliance.[52] This means that at least 16% of KCC suppliers did not demonstrate compliance and violations were included in the audits provided to KCC. This statistic proves that KCC had specific knowledge that a significant portion of its suppliers violated company compliance requirements, which includes protection against forced labor.

**52.**     Not only is KCC entirely aware of forced labor in its supply chain due to its audits, but KCC states that "most audits are conducted on an announced basis," which destroys the purpose of an audit.[53] Many of the Plaintiffs report that Brightway supervisors notified workers of audits beforehand and instructed them to either not engage with the auditors or, if they did, only say good things about the company.[54] Additionally, workers were forced to clean their accommodations and wear personal protective equipment solely for the purposes of the planned audit. Thus, the audit data is greatly skewed, making it incredibly likely that more than 16% of KCC's suppliers engaged in human rights and labor violations. However, for the purpose of this case, it is entirely sufficient that KCC was aware that 16% of its suppliers engaged in forced labor.

**53.**     KCC has been aware of forced labor in its supply chain for years and has knowingly profited and benefitted from forced labor during this time. By continuing its business relationship with Brightway until December 2021, when CBP issued the WRO, and taking entirely inadequate measures to address the known violations, KCC not only

---

[52] https://www.kimberly-clark.com/-/media/kimberly/pdf/sustainability-reports/2019/kc-2019-sustainability-report.pdf
[53] https://www.kimberly-clark.com/-/media/kimberly/pdf/slavery-and-human-trafficing/modern-slavery-statement-uk-board---26-july-2021-signed-kt.pdf?la=en-us
[54] https://www.reuters.com/world/asia-pacific/an-audit-gave-all-clear-others-alleged-slavery-2021-05-19/

allowed, but enabled the use of forced labor at Brightway. The Plaintiffs began working as forced laborers at Brightway three to four years before KCC stopped purchasing goods from Brightway, confirming that KCC knowingly benefitted from forced labor for a significant period. KCC consciously decided to ignore signs and proof of forced labor until the WRO so that it could continue to benefit and profit from the cheap, forced labor on which Brightway relied.

**D.** **Knowing that they are financially benefitting from forced labor and having the industry control to effectively end such forced labor, Defendants have knowingly continued to benefit from forced labor.**

**54.** In its 2020 Modern Slavery Report, Ansell directly acknowledges the high probability of forced labor in its supply chain and the company's responsibility to address such violations. The report notes that the company's Global Sourcing suppliers are located in the area of most risk for "modern slavery and labour rights violations, and where we have the *most leverage to influence the behaviour of our suppliers.*"[55] (emphasis added) The report goes on to note that forced labor, including debt bondage and poor working conditions, may be present at Ansell manufacturing sites in Malaysia. Ansell expressly acknowledges that it has the authority and power to effectively end such forced labor by influencing the behavior of its suppliers. However, the company fails to propose adequate or consequential measures to resolve these forced labor violations. Thus, Ansell recognizes the extreme likelihood of forced labor in its supply chain, notes its ability to end such forced labor, and then essentially admits to permitting the forced labor by failing to offer any meaningful remedies.

---

[55] https://modernslaveryregister.gov.au/statements/file/70678702-d891-4900-b982-d7fe6ed975e8/

55.     Ansell, in its 2021 Sustainability Report, doubles down on its responsibility to address issues of forced labor in its supply chain. The report states that Ansell's role in the glove manufacturing industry, with manufacturing firms in high-risk regions, "means that [they] have a clear responsibility to actively identify, assess, and address labour risks."[56] Ansell's Chief Human Resources Officer and Senior Vice President of Operations and Global Supply Chain are charged with "oversight and management of modern slavery and labour rights in our operations *and supply chain*" (emphasis added).[57] The company would not have included such responsibilities for its leaders if it did not believe that it could effectively address and control labor risks in its supply chain. Ansell successfully identified labor risks, but failed to resolve them, making the company rightfully accountable for continuing to use such known forced labor.

56.     Furthermore, in response to CBP's WRO against Brightway, Ansell confirms that it has specific authority over Brightway, noting that the company "continues to work closely with the glove maker on remediation plans."[58] If Ansell did not have the influence and ability to change operations at Brightway, it surely would not have issued such a statement. By confirming that the company was working with Brightway to resolve such issues, Ansell declared that it has, and previously had, the ability to effectively end such forced labor; it was just unwilling to do so until it was caught by CBP.

57.     KCC has also issued reports and statements confirming both its knowledge of forced labor in its supply chain, and its responsibility and ability to end forced labor.

---

[56] Ansell Sustainability Report 2021
[57] Ansell Sustainability Report 2021
[58] https://www.reuters.com/article/malaysia-brightway-orders/ansell-halts-orders-from-malaysian-glove-maker-brightway-after-us-ban-idUKL1N2TD0E1

KCC has developed a Vendor Due Diligence process "to assess potential *new* vendors against a variety of compliance risks, including human rights risks" (emphasis added) [59]. The company notably includes the word "new" to signify the program does not apply to existing vendors. KCC would not have created this process if it did not believe that it could not influence the actions of its vendors; it's just unwilling to go through the trouble of properly assessing its current vendors. It has previously be proven that KCC knew it was financially benefitting from forced labor, and KCC itself has confessed that it has the means and industry control to end such labor.

**E.   Defendants Ansell and KCC knowingly make misleading and false claims about their success in or intention of eradicating the use of forced labor in order to allow them to continue to benefit from forced labor without consequence.**

58.    Each of the Defendants has boasted of programs purporting to be dedicated to investigating, addressing, and ending the use of forced labor and trafficking victims in its supply chain. However, the reality is the opposite of the meaningless words that the Defendants offer. Ansell and KCC, like many other multinational players, believe that saying the right things will satisfy consumers and regulators and exempt them from accountability. This is classic corporate playbook behavior in which Ansell and KCC tout their policies and commitment to "doing the right thing" to consumers and regulators, but in reality, they won't change their practices until forced by law to do so. Ansell and KCC advertise themselves as socially conscious corporations, acknowledging the issues in their companies and then proposing sham programs that have no actual impact. The Defendants are intentionally misleading regulators and the public by falsely portraying

[59] https://www.kimberly-clark.com/-/media/kimberly/pdf/slavery-and-human-trafficing/modern-slavery-statement-uk-board---26-july-2021-signed-kt.pdf?la=en-us

the problems of trafficking and forced labor as resolved or minimized. This allows them to continue using and profiting from trafficked and forced labor without consequence and to delay incurring actual costs of compliance with their own standards. Among other things, these company "standards" are Defendants' admissions that using trafficked or forced labor is illegal and violates their policies. That they continue to use such trafficked and forced labor that is against their policies establishes that they are knowingly benefitting from this admittedly illegal and horrific use of forced labor.

### 1. Defendant Ansell

**59.**     In its response to CBP's WRO against Brightway, Ansell states that it knew about the labor violations at Brightway, and that it is responsible for working with Brightway to address the human trafficking and forced labor at the firm. Ansell writes that "it was aware of non-compliance at the Brightway facilities through its third-party audits and continues to work closely with the glove maker on remediation plans."[60] Further, Ansell notes that it prefers to work through such issues with suppliers rather than "reactively cancelling supplier contracts in response to specific events or allegations."[61] In publishing these statements, Ansell is admitting to knowingly benefitting from trafficking and forced labor in its supply chain even prior to CBP's filing. The company also states that it will work to address such issues with Brightway, recognizing its own role and accountability

---

[60] https://www.reuters.com/article/malaysia-brightway-orders/ansell-halts-orders-from-malaysian-glove-maker-brightway-after-us-ban-idUKL1N2TD0E1
[61] https://www.reuters.com/article/malaysia-brightway-orders/ansell-halts-orders-from-malaysian-glove-maker-brightway-after-us-ban-idUKL1N2TD0E1

as a buyer. However, Ansell does not detail how it will ensure that Brightway resolves these issues.

60.    Ansell focuses on publishing sustainability and modern slavery reports while failing to put any of its proposed plans into action. In its 2021 Sustainability Report, the company advertises a Zero Recruitment Fee Policy; it pledges to reimburse all migrant workers who paid fees to third-party agents to secure jobs at Ansell-related factories. However, Ansell has failed to follow-through and has not reimbursed all current or former Brightway employees for the massive recruitment fees they were forced to pay.[62] Until Ansell is able to match their actions to their words, their words mean nothing and only serve to divert the public's attention from the continuing issues of trafficking and forced labor.

61.    A report issued by Pensions & Investment Research Consultants Ltd. (PIRC), Europe's largest independent corporate governance and shareholder advisory consultancy, provides crucial information about Ansell's breach of human rights. PIRC identified a letter written by UK-based trade union UNISON to Ansell investors, on behalf of workers in Ansell's supply chain, asserting that Ansell is violating workers' rights in Sri Lanka. Ansell is prohibiting workers from free unionization in violation of International Labor Organization Conventions 87 and 98. Ansell has claimed that such issues have been settled; however, UNISON states that workers have been unjustifiably fired and have outstanding compensation due from Ansell. Instead of allowing free unionization and paying the workers what they are due, Ansell has created a

---

[62] https://www.theage.com.au/world/asia/gloves-off-ansell-under-fire-over-modern-slavery-at-malaysian-supplier-20211221-p59j9q.html

management-run employee committee that does not satisfy the requirements of an

independent, democratic trade union. Once again, like in the Plaintiffs' case, Ansell is

engaging in sham programs to cover up its wrongdoings while failing to address their

significant labor and human rights violations. PIRC notes that the same letter from

UNISON

> casts doubt over whether Ansell's Malaysian migrant worker
> recruitment fee reimbursement program be complete, with
> UNISON reporting that there are counter claims being made by
> workers who are yet to receive their imbursement, contrarily to
> what is stated in the company 2021 sustainability report.[63]

PIRC and UNISON are reputable, independent organizations, and their assertions

regarding Ansell's failures are well-founded. Unlike Ansell, PIRC nor UNISON have

anything to lose by stating the truth. There is concrete evidence that Ansell has breached

labor and human rights standards in numerous countries, including Malaysia and Sri

Lanka, and that the company is refusing to remediate the damage. Moreso, Ansell is

publishing lies about its remediation measures.  Ansell not only failed to adequately

address trafficking and forced labor in its supply chain when it knew about such issues,

but it has also gone the extra mile to cover up its unwillingness to redress such violations.

**62.**     Ansell continuously recites its dedication to abiding by domestic and international

law, as well as its own policies. In the company's 2021 Sustainability Report, the

company states that it has a "legal duty to comply with all laws, including those relating

to workers' rights."[64] Additionally, the company states that "Ansell is committed to

operating in accordance with all applicable laws . . . [and] aligns with the United Nations

---

[63] PIRC Ansell 2021 Report
[64] Ansell Sustainability Report 2021

Guiding Principles on Business and Human Rights as well as the International Labour

Organization (ILO) Core Conventions."[65] If Ansell were truly dedicated to adhering to

such laws and policies, it would have taken action the first time it learned of labor and

human rights violations in its supply chain. Instead, after several years and a report

finding that CBP identified 10 out of 11 ILO indicators of forced labor in Ansell's supply

chain, the company still fails to take any meaningful step towards resolving such

problems. Ansell, itself, has recognized that it is responsible for violations within its

supply chain, and it should be held accountable for such under law.

**63.**     In its 2021 Sustainability Report, Ansell describes the measures it takes to

monitor and end the use of forced labor at its suppliers' facilities. However, these

programs are surface level and entirely insufficient. Ansell writes that

> [c]oncerning reports have emerged in the media regarding the
> treatment of workers in our industry and supply chain, including
> allegations of forced labour findings leading to import bans, high
> recruitment fees, poor measures for worker safety against COVID-
> 19, excessive work hours and lack of rest days, and sub-standard
> housing for migrant workers. We closely monitor the performance
> of these critical suppliers through engagement with senior
> management and the use of third-party SMETA audits to confirm
> their actions to mitigate any non-compliances and evolve their own
> labour practices.[66]

In this statement, Ansell acknowledges abhorrent human rights violations specific not

only to its industry, but its own supply chain. The company's proposed solution is to rely

on audits and work with the suppliers' management team to resolve such violations. On

the same page of the report, Ansell states "we . . . acknowledge that audits represent a

---

[65] Ansell Sustainability Report 2021
[66] Ansell Sustainability Report 2021

33

snapshot in time and may not identify all labour rights issues."[67] After the company

recognizes the inadequacy of audits and undermines its own proposal, its answer is to

resort to "collaboration and regular communication" with the suppliers' management

team. However, the management team consists of the same people who are implementing

the inhumane policies and practices. It is absurd and unrealistic to think such internal

communication would result in any changes at the factories. Thus, Ansell's program is

circular in reasoning and relies on communication with the exact perpetrators they're

supposedly trying to stop.

### 2. Defendant KCC

**64.**     Throughout its statements and policies, KCC declares its dedication to eradicating

human rights violations in its supply chain. However, given the company's lack of

concrete steps towards such eradication, the assertions merely serve to mislead

consumers and regulators. KCC's 2018 Human Rights Policy expresses the company's

intention to prohibit child labor, prohibit all forms of forced labor, properly compensate

employees, and monitor and report human rights progress and impact within the

company. The company explicitly states that its commitment to human rights applies to

direct employees as well as workers within its supply chain.[68] KCC expects its suppliers

to abide by basic human rights and labor standards outlined in the policy, making the

suppliers' managements teams responsible for compliance. However, as with Ansell, it is

these exact management teams that are implementing the violations that are detailed

throughout this Complaint. As suppliers can mass produce goods at an extremely low

---

[67] Ansell Sustainability Report 2021
[68] https://www.kimberly-clark.com/-/media/kimberly/pdf/ethics-and-governance/human-rights-policy.pdf?la=en-us

cost by using trafficked and forced labor, and there are no details as to how KCC will ensure suppliers are abiding by its Human Rights Policy, there is essentially no way that suppliers will implement the relevant standards. Thus, the Human Rights Policy is rendered meaningless and is simply a publication issued to appease consumers, shareholders, and regulators.

**65.** KCC's statement titled "Addressing Modern Slavery in our Supply Chain" makes a series of misleading claims that allow KCC to continue using trafficked and forced labor in its supply chain without being held accountable. First, KCC states that suppliers must acknowledge and agree to KCC's Supplier Social Compliance Standards as part of their contract with KCC. However, there is no information explaining how KCC confirms that suppliers are abiding by such standards. Second, KCC has developed a Vendor Due Diligence process "to assess potential *new* vendors against a variety of compliance risks, including human rights risks."[69] (emphasis added) Notably, existing vendors, such as Brightway, are not evaluated under this process. Third, existing suppliers are audited by third parties on an announced basis.[70] As reported by the Plaintiffs, announced audits are meaningless and inaccurately reflect suppliers' operations. All of the Plaintiffs who were present during an audit were either told not to speak to the auditors or, if they did, only share good things about Brightway. Thus, announced third-party audits are an ineffective method of monitoring suppliers' operations. The programs that KCC offers as a solution

---

[69] https://www.kimberly-clark.com/-/media/kimberly/pdf/slavery-and-human-trafficking/modern-slavery-statement-uk-board---26-july-2021-signed-kt.pdf?la=en-us
[70] https://www.kimberly-clark.com/-/media/kimberly/pdf/slavery-and-human-trafficking/modern-slavery-statement-uk-board---26-july-2021-signed-kt.pdf?la=en-us

to the human rights violations in its supply chain are incomplete and faulty, proving to be sham programs rather than anything of substance.

66.     In its 2019 Sustainability Report, KCC boasts of its Forced Labor Awareness and Risk Mitigation Training program. However, only 350 KCC employees have completed the Forced Labor Awareness and Risk Mitigation Training out of 40,000 KCC employees worldwide. This means that only 0.000875% of KCC's workforce has completed the training. The fact that KCC would brag about such a program is astonishing given its negligible existence and reflects the extremely misleading nature of the company's statements.

67.     KCC continues to focus attention on its use of third-party audits in its 2019 Sustainability Report. The company conducts audits at 150 facilities annually– a trivial number of facilities given the vast international presence of the company. Perhaps even more striking is the company's statement that 84% of audited suppliers in 2019 demonstrated compliance. This means that 16% of audited suppliers were violating KCC's own compliance standards. As KCC notes in its "Addressing Modern Slavery in our Supply Chain" statement, audits are almost entirely announced, as well. Thus, a significant number of suppliers willingly violated international law and KCC's standards with the knowledge that they were being audited. If that is how warned suppliers operate, it's unimaginable how KCC's unaudited suppliers treat their workers. KCC states that it "continue[s] to engage with the . . . noncompliant suppliers to implement corrective action plans and improve their performance," but fails to mention any action steps KCC

has taken.[71] The company also fails to follow up regarding these noncompliant suppliers in its 2020 and 2021 reports. KCC admittedly knew of violations within its supply chain since at least 2019 and has provided zero evidence of concrete steps it has taken towards eradication of such violations.

**68.** Greenpeace, a champion global environmental organization, has documented KCC's record of making misleading and false statements about its intentions while acting in a directly conflicting manner. KCC also has a history of failing to comply with regulations and laws. In a 2008 report examining KCC's role in the devastation of the Kenogami Forest in Ontario, Canada, Greenpeace highlights the differences between what KCC says about sustainability and corporate responsibility, and the company's performance. In KCC's Guide for Suppliers, Thomas Falk, Chief Executive Officer of KCC, states that the company has "an ever-increasing responsibility to our customers– and to the people who use our products– to source the materials and services for the products we manufacture in an environmentally and socially responsible manner."[72] However, Greenpeace discovered that KCC had been lying for years about the source of its fibre.[73] Instead of purchasing the socially conscious fibre it claimed to have bought, KCC sourced its goods from inadequately protected areas and a mill that is at the core of a community conflict. The report contains many quotes from KCC declaring its dedication to sustainability, followed by evidence of KCC's actions to the contrary.

---

[71] https://www.kimberly-clark.com/-/media/kimberly/pdf/sustainability-reports/2019/kc-2019-sustainability-report.pdf

[72] https://www.greenpeace.org/usa/wp-content/uploads/legacy/Global/usa/report/2010/2/cut-and-run.pdf

[73] https://www.greenpeace.org/usa/wp-content/uploads/legacy/Global/usa/report/2010/2/cut-and-run.pdf

Greenpeace also finds that a "close examination of Kenogami's plans and audits reveal a lack of compliance with government-imposed regulations" on KCC's behalf.[74] Greenpeace's investigation serves as proof of KCC's ability and willingness to not only fail to comply with regulations but lie about its abhorrent conduct. KCC's behavior, as detailed in this Complaint, is not a one-time mistake; it is a pattern that is ingrained and promoted by the company's structure and management.

## IV.   HARM TO THE INDIVIDUAL PLAINTIFFS

### A. Former Forced Laborers

**69.**     Plaintiff Billal is from Cumilla, a city in the Chittagong Division of Bangladesh. He is 27 years old and the sole financial provider for his family. Billal was recruited to work for Brightway when he was a student, and his family's financial condition was poor. He needed better paid work, and a manpower agency told him about Brightway. The recruiter was careful to only mention the good parts of the company. Billal paid the travel agency $4,086 for the job opportunity before he traveled to Malaysia and joined Brightway. Billal began working at BioPro, a Brightway factory, in 2018 on the production line. He was forced to work daily from 7:00am to 5:00pm, after which he was forced to work overtime for an additional two hours, until 7:00pm. Billal could not refuse to work overtime; if he refused, the company would stop the work and not pay him for his regular work hours. Billal was also supposed to have one day off per week but was forced to work during the day. During the workday, Billal and his fellow workers had restricted access to food, water, and restrooms. Even when they had to use the restroom

---

[74] https://www.greenpeace.org/usa/wp-content/uploads/legacy/Global/usa/report/2010/2/cut-and-run.pdf

urgently, they were not permitted. Billal could barely survive on the wages he earned; he received a small base salary, and the company deducted a significant amount of money for food, accommodation, transportation, medical care, and any small mistake he made while working. If he made a mistake, he was taken to the management office, slapped, and then had his pay deducted. When Billal was injured at work, the company promised to pay for his treatment, but later deducted the cost from his paycheck. Billal always received his monthly payment late, and Brightway frequently withheld more than half of his earnings. Billal was abused and isolated financially, socially, and geographically; the company seized his passport as soon as he arrived at the factory. Billal's living conditions were just as, if not more, abhorrent than his working conditions. He lived in a hostel named Hallfood, provided by Brightway, for almost two years. He lived in one room with 70 other people and shared 3-4 washrooms with the same 70 people. The hostel was poorly maintained and unbearably hot as it did not have air conditioning or sufficient ventilation. Billal was only allowed to eat the food provided by Brightway, which was insufficient. He was also unable to access or leave his accommodation as he pleased; there were two security guards that monitored the premises, and he had to obtain permission from them to leave for a certain amount of time. When audits took place at the facility, Billal and the other workers had severely restricted interactions with the auditors. Billal reports that the audit was conducted unfairly and does not accurately represent the conditions of the facility. When Billal went to the Brightway management team about his hardships, they threatened him with reduced pay or forced departure. Billal no longer works at Brightway.

70. Plaintiff Billal endured exactly the types of trafficking and forced labor practices that served as the basis for CBP's WRO against Brightway. He brings this action on behalf of himself and all other similarly situated current and former forced laborers at Brightway. The members of the class have been forced to work and live in terrible conditions in Brightway facilities in Malaysia. As participants in their respective ventures with Brightway, specifically defined in paragraph 100, Defendants KCC and Ansell are jointly and severally liable for the illegal trafficking and forced labor of Plaintiffs by these ventures. These Defendants collectively, and each Defendant individually, have bought, distributed, and profited from the gloves manufactured by trafficked and forced laborers, including members of this class.

70. Plaintiff Md. Forhad Mia was born on May 8, 1993, and is from Chandpur, Bangladesh. Md. Forhad is the only working member of his family and must provide for his wife, child, and mother. He began working at BioPro, one of Brightway's facilities, in May 2018. A relative told him about the company, and he secured a job through Amin Tours and Travels, a manpower agency. Md. Forhad was told that he would receive a high salary, excellent accommodation, and good food at Brightway. He paid Amin Tours and Travels $4,086 to secure his position at Brightway. While he was at BioPro, Md. Forhad was forced to work a minimum of 12-hours per day, including two or more hours of forced overtime. He could not refuse to work overtime because those hours were included in his basic pay, which he needed. Md. Forhad worked seven days per week and could only take off for the holiday of Eid al-Fitr. While working, Md. Forhad had severely restricted access to food, water, and restrooms. If something went awry, he was punished by having pay deducted. His payment was always delayed, and his passport was

seized when he joined Brightway. Md. Forhad lived in Hallfood, BioPro's workers accommodation, for three years. He shared one room and 3-4 restrooms with 65 or more people. The accommodations were poorly maintained, had insufficient air conditioning and ventilation, and included inadequate food. Md. Forhad and the other workers were not allowed to cook, and thus, were only sustained by the food Brightway provided. He lost over 20 pounds because of the scant quantity and quality of food. The hostel was surrounded by three security guards, and Md. Forhad had to receive permission to leave for a specific amount of time. When an audit took place at the facilities, Md. Forhad and the other workers were only permitted to speak to the auditors briefly and were instructed by management to only share the positive sides of the company. When Md. Forhad went to management to raise his concerns about his working and living conditions, they threatened him. When Md. Forhad protested the conditions with other workers, he was arrested and taken into police custody. He was released fifteen hours later. Eventually, Md. Forhad escaped the BioPro premises, but due to his forced escape, he has limited resources and remains in Malaysia.

**71.**     Plaintiff Md. Forhad Mia endured exactly the types of trafficking and forced labor practices that served as the basis for CBP's WRO against Brightway. He brings this action on behalf of himself and all other similarly situated current and former forced laborers at Brightway. The members of the class have been forced to work and live in terrible conditions in Brightway facilities in Malaysia. As participants in their respective ventures with Brightway, specifically defined in paragraph 100, Defendants KCC and Ansell are jointly and severally liable for the illegal trafficking and forced labor of Plaintiffs by these ventures. These Defendants collectively, and each Defendant

individually, have bought, distributed, and profited from the gloves manufactured by trafficked and forced laborers, including members of this class.

**72.**     Plaintiff Jaker Hossen remains in Malaysia after being wrongly accused and imprisoned following a fight that occurred between other BioPro workers. He was not involved but BioPro falsely alleged he was, and the police put him behind bars. BioPro did not assist with his release and refused to re-hire him upon his release. Jaker first joined BioPro in 2017 after he paid a recruitment fee of $4,086 to Amin Tours and Travels. Once Jaker arrived at BioPro, the management team immediately seized his passport. Like the other Plaintiffs, Jaker was forced to work a minimum of 12-hour days with mandatory overtime. He was supposed to have one rest day per week, but frequently worked on that day, as well. The only holiday he was permitted to take was Eid al-Fitr. Jaker worked as a Line Operator, which was related to the gas supply. The line sector was full of gas, and Jaker was forced to inhale a large amount of gas that resulted in significant damage to his stomach. Jaker's stomach once started swelling because of his work and he had to pay for his own visit to and treatment at the hospital. BioPro was unwilling to pay for medical bills or other harm that occurred to its workers. While working at BioPro, Jaker had restricted access to food, water, and restrooms. For any mistake he made and the time he missed due to his work-related injury, the company deducted money from his pay. Jaker resided in Hallfood, the company's workers accommodations, for almost four years. He resided in one small room with around 70 other people. The space was poorly maintained, insufficiently ventilated, and unsanitary as the same 70 people also had to share two restrooms. The accommodations were guarded by six security guards, from whom Jaker had to obtain permission to leave the

premises. There were certain rules determining how long he could be away from the

property, and he could not return if he came back late. Jaker did not have any direct

interaction with auditors but had been told to only share the good parts of the company

unless he wanted to be punished. He later told the management team about his

mistreatment at the company, and they responded by threatening to punish him or send

him back Bangaldesh. Jaker endured physical and mental pain and abuse at BioPro and

now seeks justice.

**73.**     Plaintiff Jaker Hossen endured exactly the types of trafficking and forced labor

practices that served as the basis for CBP's WRO against Brightway. He brings this

action on behalf of himself and all other similarly situated current and former forced

laborers at Brightway. The members of the class have been forced to work and live in

terrible conditions in Brightway facilities in Malaysia. As participants in their respective

ventures with Brightway, specifically defined in paragraph 100, Defendants KCC and

Ansell are jointly and severally liable for the illegal trafficking and forced labor of

Plaintiffs by these ventures. These Defendants collectively, and each Defendant

individually, have bought, distributed, and profited from the gloves manufactured by

trafficked and forced laborers, including members of this class.

**74.**     Plaintiff Shuvo is from Narayanganj, Bangladesh, and is the sole breadwinner for

his parents and two younger sisters. A colleague told Shuvo about Brightway and said

that he would work in an air-conditioned office with good food provided by the company.

The reality was completely different. Shuvo paid a recruitment fee of $4,086 to Sunjaria

Agency to secure his job. Once Shuvo arrived at BioPro, he was forced to work from

7:00am to 7:00pm, and sometimes even longer. He often worked seven days per week

with restricted access to food, water, and restrooms. Shuvo endured physical and mental abuse; he was slapped, beaten, yelled at, and threatened with death. His payment was delayed and reduced for any small mistakes he made, even if they were not his fault. Brightway also seized his passport; fortunately, Shuvo was able to repossess it because his bank card broke, and he needed a form of identification. While working at BioPro, Shuvo lived in Hallfood, the hostel on the company's grounds. He shared one bedroom and insufficient restroom facilities with dozens of other people. They were only allowed to eat food from the company's canteen, and BioPro deducted funds from their monthly pay for the canteen. The premises were patrolled by three security guards during the day and night; Shuvo had to provide a written reason to leave and was only permitted to leave for two hours if granted permission. When auditors came to inspect the facilities, the management team told the workers to only say good things about the company. If the workers strayed from these instructions, they were to be punished. Brightway learned that Shuvo and another worker, Tuhin, were reporting human rights violations at BioPro, and increased abuse of Shuvo. While reporting the violations, Shuvo connected with Andy Hall, a migrant worker and labor rights activist, and told him of the direness of his situation at Brightway. Mr. Hall engaged in discussions with Chris Weber, Associate Director, Responsible Supply Chain at KCC and Lisa Morden, Vice President of Safety, Sustainability, and Occupational Health at KCC regarding an evacuation plan for Shuvo. Ian Spaulding, the head of Elevate Ltd., an auditing firm used by KCC, also participated in these talks. Mr. Weber and Ms. Morden tentatively accepted responsibility for the safety of Shuvo and agreed to cover the costs of relocating Shuvo and providing severance pay. However, at the last minute, they backed out, and Elevate Ltd. stepped in

to provide for Shuvo's travel costs. This was all too late, though, because by then, Shuvo had been revealed as a whistleblower and targeted by Brightway. He faced serious threats to his safety and was forced to escape to Bangladesh before Elevate was able to complete arrangements to provide him with sufficient resources to escape and return to Bangladesh with funds to survive.

75.     Plaintiff Shuvo endured exactly the types of trafficking and forced labor practices that served as the basis for CBP's WRO against Brightway. He brings this action on behalf of himself and all other similarly situated current and former forced laborers at Brightway. The members of the class have been forced to work and live in terrible conditions in Brightway facilities in Malaysia. As participants in their respective ventures with Brightway, specifically defined in paragraph 100, Defendants KCC and Ansell are jointly and severally liable for the illegal trafficking and forced labor of Plaintiffs by these ventures. These Defendants collectively, and each Defendant individually, have bought, distributed, and profited from the gloves manufactured by trafficked and forced laborers, including members of this class.

76.     Plaintiff Mia Masum was a victim of abuse and retaliation at the hands of Brightway. He began working at Brightway's BioPro facility in 2017 and was sent back to Bangladesh in November 2020 after participating in a strike against the company. Mia and other workers went on strike to protest the high, retained recruitment fees they paid to join Brightway. In response, Brightway hired local gangs to control and beat the workers. After the beating stopped, Brightway confined several of the workers, including Mia, in one room for three days without food before sending them back to Bangladesh without notice. This inhumane and abhorrent treatment was unfortunately not new to

Mia; he had been physically and mentally abused by Brightway since he joined the company three years earlier. Mia was first introduced to Brightway by an agent at Century Travel Services, to whom he paid a $4,089 recruitment fee. When Mia arrived at BioPro, the company immediately seized his passport, and he began working 12 hours per day, 7 days per week. If the company had urgent jobs, Mia was unable to refuse them, making his days often longer than 12 hours. Brightway fixed production targets, and if Mia failed to meet his targets, he would be punished physically and mentally, as well as have his salary reduced. Mia was yelled at, slapped, and often beaten if he made any mistakes. He was not permitted to eat or use the restroom as needed; he always needed permission from his supervisor. Mia reported that abuse was widespread in the factory, and it happened to himself and other workers daily. The company did not provide Mia with training or personal protective equipment, making his unsafe job even more hazardous. The living conditions were just as horrible as, if not worse than, the working conditions. Mia resided in the factory hostel with 70 other people in one room, sharing two indoor toilets and showers. The facilities were overcrowded and unsanitary; when the workers requested necessary repairs, the company did not address them in a timely manner, and then deducted the amount from the workers' salary once they did so. Mia often felt ill while working because the accommodations were so crowded and poorly ventilated that he was frequently unable to sleep. When he reported these issues to the management team, they got angry and threatened him. Mia was prohibited from sharing his experience with auditors and was required to clean everything and wear proper personal protective equipment prior to and during the audit. All of this abuse led to Mia participating in a strike, being sent home, and now seeking redress.

46

**77.**     Plaintiff Mia Masum endured exactly the types of trafficking and forced labor practices that served as the basis for CBP's WRO against Brightway. He brings this action on behalf of himself and all other similarly situated current and former forced laborers at Brightway. The members of the class have been forced to work and live in terrible conditions in Brightway facilities in Malaysia. As participants in their respective ventures with Brightway, specifically defined in paragraph 100, Defendants KCC and Ansell are jointly and severally liable for the illegal trafficking and forced labor of Plaintiffs by these ventures. These Defendants collectively, and each Defendant individually, have bought, distributed, and profited from the gloves manufactured by trafficked and forced laborers, including members of this class.

**78.**     Plaintiff Md. Kamruzzaman joined BioPro in 2017 so that he could financially support his parents, brother, and sister-in-law. A friend of his told him about Brightway and introduced him to an agent from Amin Tours and Travels. Md. Kamruzzaman was told that he would receive high pay and other benefits, and he paid a recruitment fee of $4,086 to Amin Tours and Travels to secure his spot at Brightway. Like the other Plaintiffs, Md. Kamruzzaman worked minimum 12-hour days, including forced overtime, for six to seven days per week. His work was physically demanding, and he struggled to perform his duties while only consuming the small amount of food the company provided. He was not allowed to cook or bring food into his shared room in the hostel, making him entirely dependent on the company's canteen. Md. Kamruzzaman experienced mental and physical anguish due to the Brightway's mistreatment, and the large amount of chemicals he consumed on the job resulted in blood dysentery. When Md. Kamruzzaman refused to work due to his illness, Brightway punished him by

prohibiting him to work for seven days and deducting pay for those seven days from his salary. Md. Kamruzzaman's payment was always delayed by several weeks, and the Brightway seized his passport upon his arrival. He had no autonomy while working at BioPro and was treated as a slave with very limited access to food, water, restrooms, and his rightful pay. Md. Kamruzzaman lived in the same Brightway-provided hostel as many of the other Plaintiffs, sharing one room with 70 other people. He also reported that it was overcrowded, unsanitary, and poorly maintained. Md. Kamruzzaman was unable to leave the premises as he desired and had to obtain permission from the security guards to leave the area for a designated period of time. He was not allowed to be present when auditors visited the facilities, as the management feared he would tell them the truth about the company and facilities. When Md. Kamruzzaman directly confronted the management team about his grievances, they threatened him. After several years, Md. Kamruzzaman fled the BioPro facility with ten other workers. He remains in Malaysia and hopes to return home to his family soon.

79.    Plaintiff Md. Kamruzzaman endured exactly the types of trafficking and forced labor practices that served as the basis for CBP's WRO against Brightway. He brings this action on behalf of himself and all other similarly situated current and former forced laborers at Brightway. The members of the class have been forced to work and live in terrible conditions in Brightway facilities in Malaysia. As participants in their respective ventures with Brightway, specifically defined in paragraph 100, Defendants KCC and Ansell are jointly and severally liable for the illegal trafficking and forced labor of Plaintiffs by these ventures. These Defendants collectively, and each Defendant

individually, have bought, distributed, and profited from the gloves manufactured by trafficked and forced laborers, including members of this class.

**80.**    Plaintiff Md. Sha Alam Sarker was deceived and persuaded to pay a significant recruitment fee to join BioPro, just like the other Plaintiffs. He is the only working member of his family and was desperate for a job that would allow him to financially support his parents, wife, and daughter. Md. Sha Alam paid Amin Tours and Travels $3,871 for his role at BioPro, which he joined in 2018. Once he arrived at the BioPro factory, Md. Sha Alam worked from 6:30am to 6:30pm every day, and his only holiday off was Eid al-Fitr. The factory was unbearably hot, and Md. Sha Alam Sarker had restricted access to food, water, and restrooms. He did not receive any training and was only provided a thin cap and mask as personal protective equipment, for which the company deducted money from his salary. BioPro did not care about the workers' discomfort or health, as evident by the working and living conditions Md. Sha Alam Sarker endured. He lived in Hallfood, the hostel, for about three years in a shared room with more than 70 other people. He was not provided a bed or pillow, and there were so many insects in the room that he was often unable to sleep. Security guards surrounded the BioPro complex, and Md. Sha Alam Sarker was only allowed to leave for a maximum of three hours if he had explicit permission. If he did not return within the time frame, he was forced to sleep outside of the property. As with the other Plaintiffs, Brightway took away Md. Sha Alam Sarker's passport when he joined the company. Following years of forced labor and abuse, Md. Sha Alam Sarker managed to escape from the grounds. He remains in a perilous situation and has been unable to return home.

81.    Plaintiff Md. Sha Alam Sarker endured exactly the types of trafficking and forced labor practices that served as the basis for CBP's WRO against Brightway. He brings this action on behalf of himself and all other similarly situated current and former forced laborers at Brightway. The members of the class have been forced to work and live in terrible conditions in Brightway facilities in Malaysia. As participants in their respective ventures with Brightway, specifically defined in paragraph 100, Defendants KCC and Ansell are jointly and severally liable for the illegal trafficking and forced labor of Plaintiffs by these ventures. These Defendants collectively, and each Defendant individually, have bought, distributed, and profited from the gloves manufactured by trafficked and forced laborers, including members of this class.

82.    Plaintiff Sohel worked at BioPro as a Line Worker for two years before he was forced to escape due to abuse, severe health problems, and police intervention. Sohel was introduced to the company through a relative and attended a seminar hosted by the company that presented only positive content. Sohel was persuaded to join Brightway, and paid Sultan Malaysia, a manpower agency, $4,301 to secure his job. Brightway has not reimbursed Sohel for this enormous recruitment fee that put him in debt. When Sohel joined the company, he worked 12 hours per day, including three hours of overtime. If he refused to work overtime, the company would cut his pay for the entire day. Sohel was supposed to have one rest day per week, but frequently worked that day. Sohel experienced severe work-related health problems during his time at BioPro; he was forced to inhale gas in an unbearably hot factory that made him vomit and faint on several occasions. A co-worker brought him to the hospital when he fainted, but the company failed to assist in any way. Sohel was not permitted to drink water, use the

restroom, or consume food as needed during the workday. Unfortunately, these abuses were not particular to Sohel, and he watched nearly all of his co-workers be subjected to the same treatment. Sohel resided in the abhorrent accommodations provided by Brightway for almost two years, living in one room with more than 60 other people. The living conditions were abominable, and the six security guards made it challenging for workers to leave the premises. Sohel had to obtain permission to leave the premises for a maximum of two hours, and if he stayed out for longer, he faced punishment by the guards. Sohel witnessed one audit and noted that supervisors taught the workers to share only good things about the company. If the workers failed to do so, they would be punished. When Sohel finally protested the abuses he faced and demanded the money he was owed, the company called the police. Sohel was arrested and later bailed out by the company when fellow workers went on strike for the arrests. However, after bail, Brightway refused to feed Sohel for 12 hours. After this occurrence, Brightway sent Sohel back to Bangladesh but deducted the price of the ticket from his pay. Sohel took significant measures to provide for his family, going so far as to pay a huge recruitment fee and move to Malaysia to work at Brightway. Instead of receiving his hard-earned money, he was forced to work extreme hours in insufferable conditions. Sohel seeks redress and justice for his pain, suffering, and inhumane treatment.

**83.**     Plaintiff Sohel endured exactly the types of trafficking and forced labor practices that served as the basis for CBP's WRO against Brightway. He brings this action on behalf of himself and all other similarly situated current and former forced laborers at Brightway. The members of the class have been forced to work and live in terrible conditions in Brightway facilities in Malaysia. As participants in their respective ventures

with Brightway, specifically defined in paragraph 100, Defendants KCC and Ansell are jointly and severally liable for the illegal trafficking and forced labor of Plaintiffs by these ventures. These Defendants collectively, and each Defendant individually, have bought, distributed, and profited from the gloves manufactured by trafficked and forced laborers, including members of this class.

**84.**     Plaintiff Mohammad Sumon and his family were living from hand to mouth before he joined Brightway in 2018. His father was deceased, and Mohammad was responsible for taking care of his mother and younger brother. Mohammad learned of Brightway through an agent at Alam Agency, who told him that his accommodations, food, and visa renewal would be handled by the company. It was not disclosed to Mohammad that those services would be deducted from his paycheck at high rates. Mohammad paid Alam Agency $4,301 for his job at BioPro and has not been reimbursed by Brightway for this fee. Between 2018 and 2020, Mohammad worked 12-hour workdays, including forced overtime, at BioPro on the production line. He often worked seven days per week, and his only holiday was Eid al-Fitr. Mohamad was responsible for collecting and cutting the gloves from the line, which was risky and unsafe. He inhaled significant amounts of gas, worked in unbearable heat, and experienced some minor injuries to his fingers and leg. Mohammad did not receive any training or safety equipment before or during his work. While working, Mohammad had restricted access to food, water, and restrooms; he was only allowed to use the restroom if another worker agreed to cover his work. BioPro initially issued payment 20 days late, and after Mohammad complained, he began receiving his pay within 5-7 days, but with only half of the compensation he was owed. Mohammad had to put some of his limited earnings

towards medical care when he was injured on the job because the company refused to pay for it. While working at BioPro, Mohammad resided in the Hallfood hostel, living in one room with 70 people. The hostel had wildly insufficient restrooms, and the entire complex was poorly maintained. The workers were only allowed to eat the food provided by the company, which was hard to digest and led to Mohammad's physical weakness. Security guards monitored the hostel, and Mohammed was only able to leave for a limited period of time with permission from the guards. Mohammad eventually escaped from BioPro in 2020 after he was arrested at the direction of the company. He was imprisoned for 15 hours before being released, and once released, found a way to escape from the company. As Mohammad was forced to escape, BioPro did not pay for his return home, and he is still stranded in Malaysia.

85.    Plaintiff Mohammad Sumon endured exactly the types of trafficking and forced labor practices that served as the basis for CBP's WRO against Brightway. He brings this action on behalf of himself and all other similarly situated current and former forced laborers at Brightway. The members of the class have been forced to work and live in terrible conditions in Brightway facilities in Malaysia. As participants in their respective ventures with Brightway, specifically defined in paragraph 100, Defendants KCC and Ansell are jointly and severally liable for the illegal trafficking and forced labor of Plaintiffs by these ventures. These Defendants collectively, and each Defendant individually, have bought, distributed, and profited from the gloves manufactured by trafficked and forced laborers, including members of this class.

86.    Plaintiff Nurul Amin is 32 years old and must provide for his parents and younger brother. Nurul previously worked at a medical company, but the pay was too low to

financially support his family, all of whom are wholly financially dependent on him. When Nurul's uncle raved about Brightway to him and introduced him to an agent from Amin Tours and Travels, Nurul found it difficult to refuse the offer. Nurul paid Amin Tours and Travel $3,441 in full before moving to Malaysia. Once Nurul arrived at BioPro, he worked from 6:30am to 6:30pm, including four hours of mandatory overtime. He was supposed to have one rest day per week, but was forced to work that day, as well. Nurul endured constant physical and mental abuse by the BioPro management team, who did not care about workers' safety or wellbeing. While working, Nurul suffered a severe leg injury after his leg was caught in a chain. When the injury occurred, Nurul waited for his manager for two hours, but his manager never came. Thus, Nurul was forced to find treatment on his own, and pay for it himself. The company never acknowledged his injury and did not reimburse him for the cost of his treatment. Nurul's payment was always delayed by at least 15 days, and his passport was seized when he joined the company. Nurul, like many of the other Plaintiffs, resided in Hallfood, the horrific accommodations provided by Brightway. He noted the unsanitary living conditions, inadequate ventilation and food, and severely restricted ability to leave the premises. Three days before an audit occurred at the facility, Nurul and his fellow workers were forced to practice saying all good things about the company. However, when the auditors arrived, Nurul was not allowed to interact with them. In 2020, when Nurul and others protested the company for their rightful compensation, he was shortlisted and threatened. To avoid punishment, Nurul fled the company.

87.    Plaintiff Nurul endured exactly the types of trafficking and forced labor practices that served as the basis for CBP's WRO against Brightway. He brings this action on

behalf of himself and all other similarly situated current and former forced laborers at
Brightway. The members of the class have been forced to work and live in terrible
conditions in Brightway facilities in Malaysia. As participants in their respective ventures
with Brightway, specifically defined in paragraph 100, Defendants KCC and Ansell are
jointly and severally liable for the illegal trafficking and forced labor of Plaintiffs by
these ventures. These Defendants collectively, and each Defendant individually, have
bought, distributed, and profited from the gloves manufactured by trafficked and forced
laborers, including members of this class.

88.    Plaintiff Md. Habibullah Mia was the sole breadwinner for his 8-person family
when he joined Brightway in 2018. A representative of a manpower agency told Md.
Habibullah Mia that it was the opportunity of a lifetime to work for Brightway and
pressured him to join the company. Md. Habibullah Mia eventually succumbed to the
pressure and paid the agency $2,690 in full to secure a position at BioPro in Malaysia.
Once Md. Habibullah Mia arrived at BioPro, he was forced to work minimum 12 hours
days, often with additional overtime. If he refused to work overtime, his supervisors
would take away his employee card and deduct pay from his salary. Md. Habibullah Mia
was supposed to have one day off per week but was forced to work on these days. He had
restricted access to food, water, and restrooms during the workday, and once fainted from
the excessive heat in the factory. The company did not care about workers' conditions
and did not pay any attention to Md. Habibullah Mia's fainting episode. Md. Habibullah
Mia was constantly verbally abused, and witnessed supervisors physically assaulting
other workers, including hitting his friend with a steel scale. While at BioPro, Md.
Habibullah Mia lived in Hallfood, the hostel next to the factory. He lived there with 70

other people and had to share a bed with another worker. He lived in unsanitary, overcrowded conditions that were monitored and controlled by Brightway management. Workers were only allowed to eat food from the canteen, even though it was barely edible, and they were fined if they tried to cook anything for themselves. Md. Habibullah Mia was physically and socially isolated as the management team seized his passport when he arrived, and six security guards always patrolled the compound. If Md. Habibullah Mia wanted to leave the premises, he had to obtain permission to leave for a set period of time and could not return late. When auditors visited BioPro, they only spoke to the management team; workers were prohibited from having any contact with them. After years of inhumane treatment, most of the workers, including Md. Habibullah Mia, protested their living and working conditions. The company retaliated and threatened Md. Habibullah Mia following the protest. Md. Habibullah Mia was forced to run away and remains in Malaysia as he does not have the means or ability to return home to Bangladesh.

**89.**      Plaintiff Md. Habibullah Mia endured exactly the types of trafficking and forced labor practices that served as the basis for CBP's WRO against Brightway. He brings this action on behalf of himself and all other similarly situated current and former forced laborers at Brightway. The members of the class have been forced to work and live in terrible conditions in Brightway facilities in Malaysia. As participants in their respective ventures with Brightway, specifically defined in paragraph 100, Defendants KCC and Ansell are jointly and severally liable for the illegal trafficking and forced labor of Plaintiffs by these ventures. These Defendants collectively, and each Defendant

individually, have bought, distributed, and profited from the gloves manufactured by trafficked and forced laborers, including members of this class.

90.     Plaintiff Md. Akhhruzzaman Sardar had worked for BioPro for four years when he faced retaliation from the company for protesting withheld compensation. Md. Akhhruzzamna initially heard about Brightway through an Amin Tours and Travel agent, and he was shown a marketing video displaying excellent working conditions, free quality food, and strong reviews from Bangladeshi workers at BioPro. Md. Akhhruzzaman felt motivated after watching the video and paid Amin Tours and Travel $3,016 upfront to secure a job at Brightway. While at BioPro, Md. Akhhruzzaman worked 12-hour days, from 7:00am to 7:00pm with required overtime. The rules at the factory were extremely strict and workers were subject to brutal punishment if they broke any of the rules. Md. Akhhruzzaman was hit on the head by a member of the management team, whom they called Silver, and witnessed his fellow workers be physically and mentally abused. Md. Akhhruzzaman stayed in a different Brightway-provided hostel, Allport, during his time at BioPro. He lived with 70 people in a single room, which made it unbearably hot and suffocating. There were three toilets for 70 people which were dirty and poorly maintained. He and the other workers were forced to eat the food provided by Brightway because they were not permitted to prepare their own meals. Md. Akhhruzzaman paid a significant monthly fee for the food, even though it was very poor in quality. While at BioPro, Md. Akhhruzzaman worked as a storekeeper and kept the exit and entry records. For that reason, he did not have restricted access to and from the accommodations. However, Md. Akhhruzzaman had different rules and duties than the workers working the line, and he shared that the other workers had

57

severely restricted abilities to leave the premises. Furthermore, Md. Akhhruzzaman did not have unlimited freedom; BioPro seized his passport when he joined the company and he remained physically and socially isolated from society. Like many of the other workers, Md. Akhhruzzaman was never allowed to meet with auditors, even when he was aware an audit was coming. In 2021, Md. Akhhruzzaman and other BioPro employees learned that workers at other glove companies were receiving additional compensation from their companies, but BioPro was not matching the payments. Many of the BioPro workers stopped working to protest, as BioPro was withholding funds from them, and BioPro responded by threatening to fire protestors and send them back to Bangladesh. As Md. Akhhruzzaman needed to stay in Malaysia to work, he fled the factory and sought alternative employment. BioPro has withheld compensation due to him.

91.    Plaintiff Md. Akhhruzzaman endured exactly the types of trafficking and forced labor practices that served as the basis for CBP's WRO against Brightway. He brings this action on behalf of himself and all other similarly situated current and former forced laborers at Brightway. The members of the class have been forced to work and live in terrible conditions in Brightway facilities in Malaysia. As participants in their respective ventures with Brightway, specifically defined in paragraph 100, Defendants KCC and Ansell are jointly and severally liable for the illegal trafficking and forced labor of Plaintiffs by these ventures. These Defendants collectively, and each Defendant individually, have bought, distributed, and profited from the gloves manufactured by trafficked and forced laborers, including members of this class.

92.    Plaintiff Md. Imamul Hossain took out a substantial loan to pay his recruiting fee to work at Brightway and has been paying it down for the past 4 years. He took a job at

Brightway so that he could support his parents, brother, and sister. Md. Imamul heard

about Brightway from an Amin Tours and Travel agent, and he was told that he would

work at Top Glove in Malaysia once he paid the $4,039 recruitment fee. However, upon

arrival in Malaysia, he was forced to join BioPro in the Production Department. Md.

Imamul worked daily from 6:00am-6:00pm, and if he missed a day, he was punished. He

worked in a hot, suffocating environment full of intoxicating gases. Md. Imamul was not

permitted to access the toilet or have food and water as needed. He was frequently

punished by his supervisors; if any gloves were not taken from the production line at the

correct time, he was slapped and kicked. Due to the unsafe and unsanitary work

environment, Md. Imamul developed a mouth ulcer, but was not permitted to see a doctor

for a significant period. Once his supervisors finally allowed him to see a doctor, he had

to pay the healthcare fee and was not reimbursed, even though he was injured on the job.

Md. Imamul struggled to pay for his medical care as his paychecks were always delayed

and he made a minimal amount after BioPro deducted funds for the mandatory canteen

and any minor mistakes. The canteen cost a significant amount of money even though it

was barely edible, and the workers frequently found cockroaches or frogs in their food.

While at BioPro, MD. Imamul lived in Allport, a hostel on the premises. He stayed in a

room that he shared with 70 other workers. The room was near the jungle and the

workers often found snakes, frogs, and insects in their sleeping quarters. The BioPro

premises, which included the hostel and canteen, were monitored by security guards,

restricting workers' ability to leave. Md. Imamul had to obtain permission to leave the

grounds, but it was challenging to receive such permission. During the pandemic, Md.

Imamul, along with many other BioPro workers, protested withheld compensation from

Brightway management. Workers at other glove factories received payments through their companies from foreign buyers, but BioPro did not provide their workers with this compensation. After the protest, BioPro retaliated and threatened to send those who protested back to their home country. However, Md. Imamul needed to retain work in Malaysia to support his family; at that time, his mother was fighting cancer and he needed money for her treatment. Thus, Md. Imamul escaped from BioPro before they could fire him and send him back to Bangladesh without any employment opportunities.

93.    Plaintiff Md. Imamul endured exactly the types of trafficking and forced labor practices that served as the basis for CBP's WRO against Brightway. He brings this action on behalf of himself and all other similarly situated current and former forced laborers at Brightway. The members of the class have been forced to work and live in terrible conditions in Brightway facilities in Malaysia. As participants in their respective ventures with Brightway, specifically defined in paragraph 100, Defendants KCC and Ansell are jointly and severally liable for the illegal trafficking and forced labor of Plaintiffs by these ventures. These Defendants collectively, and each Defendant individually, have bought, distributed, and profited from the gloves manufactured by trafficked and forced laborers, including members of this class.

## V.    CLAIMS FOR RELIEF

### COUNT I
### FORCED LABOR BY ALL FORMER FORCED LABORERS
### AGAINST DEFENDANTS KCC AND ANSELL
### TVPRA, 18 U.S.C. § 1589

94.     Plaintiffs reallege and incorporate by reference all paragraphs previously alleged herein.

95.     As trafficked and forced laborers, the Former Forced Laborers were deprived of their freedom and forced to endure severe physical and mental abuse. They were forced to work for an inhumane number of hours with severely restricted access to food, water, and restrooms. The work the Plaintiffs performed directly benefitted Brightway and the Defendants, Ansell and KCC. The Plaintiffs were coerced into working for Brightway through deception and necessity. Many of the Plaintiffs were struggling to financially support their families and were targeted because of this vulnerability. When the Plaintiffs arrived at Brightway, they were forced to work twelve-hour days with limited to no training and protective equipment. The working conditions were abysmal, as were the accommodations. All of the Plaintiffs lived in the overcrowded, unsanitary, and overheated hostels run by Brightway and given meager food to survive.

96.     To keep Plaintiffs from refusing work or escaping, the BioPro management team constantly deducted substantial amounts from the Plaintiffs' paychecks. This pattern created a system of debt bondage and kept Plaintiffs in a cycle of forced labor. Plaintiffs and other workers were unable to escape BioPro because of physical and financial constraints. The factory and hostel were in one area that was always patrolled by security guards. Plaintiffs were unable to leave the premises as they pleased; they had to obtain permission from the guards to leave for a specific amount of time. Even if Plaintiffs and other workers escaped from Brightway, they often did not have the financial means to return to Bangladesh. Thus, several Plaintiffs remain in Malaysia, still trying to find a

way home. Brightway's operations rely on human trafficking and forced labor, and the company has significant measures in place to ensure the process continues.

97.     Labor exacted from the Former Forced Laborers through the means described herein, including coercion and deception, high recruitment fees, debt bondage, physical and mental abuse, seizure of passports, physical restraints from leaving the premises, and threats from management are clearly within the range of "forced labor" under § 1589 of the TVPRA. Physical, mental, and financial harm are "serious harms" under § 1589(c)(2), which trigger liability under §§ 1589 and 1595. Further, the Defendants, with their immense resources and presence, as well as with their accumulated knowledge across years of schemes admitting to using forced labor while claiming to be working to end it, knew or recklessly disregarded the facts about this systematic forced and abusive labor endured by Plaintiffs and thousands of other migrant workers.

98.     Under §1595(a) of the TVPRA, Defendants Ansell and KCC are liable if they (1) participated in a venture; (2) "receiv[ed] anything of value" from the venture; and (3) knew or should have known that the venture had engaged in forced labor as defined by § 1589. As previously alleged, Defendants knowingly benefitted from forced labor in Brightway's manufacturing factory in Malaysia, and the three elements required for liability under the TVPRA are easily satisfied in this case.

**KCC and Ansell were Participants in the Disposable Glove Manufacturing Supply Chain "Venture"**

99.     The forced labor provision of the TVPRA, 18 U.S.C. § 1589, states "[w]hoever knowingly benefits, financially or by receiving anything of value, from participation in a venture" which employs forced labor may be held responsible under the Act. Defendants

Ansell and KCC knowingly participated in and benefitted from a venture that included

forced labor, and thus, the parties can be held civilly liable under the TVPRA.

100.    Within the context of cases applying the TVPRA, there are two widely-accepted

definitions of "venture:" (1) "any group of two or more individuals associated in fact,

whether or not a legal entity;"[75] or "[i]n the absence of a direct association, Plaintiff must

allege at least a showing of a continuous business relationship . . . such that it would

appear that the [co-venturers] have established a pattern of conduct or could be said to

have a tacit agreement."[76] Here, under either definition, KCC and Ansell are in a venture

with Brightway. Well beyond an "association in fact" or a "tacit agreement," both KCC

and Ansell had a direct contractual relationship with Brightway that also gave them the

authority to require that Brightway not engage in trafficking or forced labor. However,

neither KCC nor Ansell exercised that authority in order to continue profiting from the

low-priced Brightway gloves manufactured by the systematic trafficking and forced labor

of Brightway's workers, including Plaintiffs herein. In this case, there are two distinct

ventures, one between KCC and Brightway and one between Ansell and Brightway.

Because KCC and Ansell were contractually acquiring Brightway's gloves during the

times Plaintiffs were injured, KCC and Ansell are jointly and severally liable for

Plaintiffs' injuries.

101.    Ansell and KCC have publicly recognized their supplier-buyer relationship with

Brightway. Ansell, in an email to Reuters, shared that it suspended North American

---

[75] This derives from a parallel criminal provision of the TVPRA, 18 U.S.C. § 1591(e)(6).

[76] This widely accepted definition originated in *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 970 (S.D. Ohio 2019).

orders from Brightway because of CBP's WRO against Brightway in December 2021.[77]
Ansell confirmed that it has a supply contract with Brightway and that it sought to work
with Brightway to address the violations.[78] KCC also recognized the company's
relationship and joint venture with Brightway in its response to CBP's WRO against
Brightway. KCC confirms that Brightway is a direct supplier, stating that "if appropriate
remedies are not put in place . . . Kimberly-Clark will re-evaluate our relationship with
Brightway, including the potential termination of our *supply agreement*" (emphasis
added).[79] The Defendants expressly confirm the corporate relationships with Brightway,
which is more than sufficient to establish each was in a "venture" under section 1596(a).

102.     Defendants, Ansell and KCC are "participants" in their respective ventures. As
long as they are within the "venture" that trafficked the Plaintiffs and forced them to
work, they do not need to be the principal perpetrators of the labor violations to be held
liable under § 1595. The great weight of authority is that a venturer is liable even if he
was not an active participant in the wrongful acts of the venture. *See, e.g.*, *M.A. v.
Wyndham Hotels & Resorts, Inc.*[80]

103.     Defendants' ongoing support of Brightway through massive purchase agreements
is material support that keeps Brightway in business without requiring them to stop their
illegal use of forced labor. Defendants' substantial business agreements with Brightway
directly correlate to the control they have to reduce the incidence of forced labor at

---

[77] https://www.reuters.com/article/malaysia-brightway-orders/ansell-halts-orders-from-malaysian-glove-maker-brightway-after-us-ban-idUKL1N2TD0E1
[78] https://www.reuters.com/article/malaysia-brightway-orders/ansell-halts-orders-from-malaysian-glove-maker-brightway-after-us-ban-idUKL1N2TD0E1
[79] https://www.business-humanrights.org/fr/dernières-actualités/kimberly-clarks-response-re-brightway/
[80] 425 F.Supp.3d 959, 970 (S.D. Ohio 2019).

Brightway factories. The Defendants' repeated failures to address and resolve forced labor at Brightway, despite specific knowledge of multiple violations, reinforces the fact that Defendants have no intention to end it. Rather, they purposefully choose to reap the benefits of the cheap, forced labor used at Brightway for as long as possible. The only reason that Defendants have temporarily paused their importation of Brightway manufactured gloves is because of CBP's WRO forcing them to do so. Without this governmental action, Defendants would have continued their relationship with Brightway, knowing about the forced labor in their supply chain and not caring. Neither Ansell nor KCC has even ended its business relationship with Brightway; they are simply pausing American importation until CBP modifies the WRO to re-permit importation. Defendants' ongoing support of Brightway, despite concrete evidence of forced labor and CBP action, is both clear and unwavering.

**Defendants Knowingly Received Something of Value From The "Venture"**

**104.**     Based on § 1595 of the TVPRA, "whoever knowingly benefits" from forced labor, as defined by § 1589, can be held liable. As previously alleged, Defendants Ansell and KCC knowingly benefitted from the ongoing forced labor of trafficked workers in their supply chains and have intentionally published misleading statements to continue benefitting without consequence. Defendants are able to purchase disposable gloves for significantly lower prices because the gloves are manufactured by individuals who are forced to work extreme hours with minimal pay. Defendants, through their venture, resist implementing any meaningful procedures or policies to end trafficked and forced labor because it would result in increased prices for disposable gloves.

105.     Defendants Ansell and KCC both gain financially from their participation in the venture based on sheer profits and an advantage over more ethical companies. Ansell and KCC are two of the largest and most profitable distributors of disposable gloves in the United States, proving their financial success that is dependent on gloves manufactured at Brightway. The use of forced labor at Brightway enables Ansell and KCC to obtain less expensive disposable gloves than companies that are legitimately dedicated to eradicating the use of forced labor in their supply chain. Thus, Ansell and KCC gain substantially through the operations as they currently exist at Brightway.

**Defendants Knew or Should Have Known That Their Respective Ventures had Engaged in Forced Labor as Defined by § 1589**

106.     As previously alleged, Defendants KCC and Ansell knew and should have known that their disposable glove supply chains are based on trafficked and forced labor. *See* paragraphs 31-57, *supra*. Defendants' admissions regarding forced labor in their industry and supply chains serve as proof that they knew or should have known that they were profiting from trafficked and forced labor in their supply chains. Defendants' corporate statements, policies, and employee trainings indicate that they each have specific knowledge that their supply chains profit from forced and trafficked labor. In addition, as previously alleged, Andy Hall provided regular notice to senior managers of KCC and Ansell of endemic trafficking and forced labor in their latex glove supply chains in Malaysia, as well as defective auditing practices at Brightway. KCC and Ansell's knowledge extends further than mere awareness of forced labor in the disposable glove industry in Malaysia– they have specific previous and current knowledge of trafficking and forced labor in their supply chains.

**107.**     Defendants Ansell and KCC knowingly aided and abetted and benefitted enormously from a system that forces trafficked humans to work inhumane hours for minimal compensation. Plaintiffs could not refuse to work overtime and were forced to work and live in horrendous conditions. They paid high recruitment fees to join Brightway and upon arrival, continuously had fees deducted from their pay for all kinds of absurd reasons. This pattern created a system of debt bondage, which made it financially implausible for them to escape Brightway and return home to Bangladesh. Plaintiffs also lived and worked under the constant threat of physical and mental abuse from their supervisors and the guards surrounding the compound.

**108.**     The forced labor perpetuated by the venture that all Defendants are responsible for has caused the Former Forced Laborers to experience significant physical and mental anguish, emotional distress, and enormous pain and suffering. The Former Forced Laborers are thereby entitled to compensatory and punitive damages in amounts to be proven at trial.

**109.**     Defendants KCC and Ansell, as key members of and participants in the supply chain venture with Brightway, are liable for the injuries caused to the Plaintiffs. Further, Defendants are all jointly and severally liable for the injuries caused to Plaintiffs by Defendants' joint actions and participation in the plans and programs that depend upon forced or trafficked labor.

<u>**COUNT II**</u>

**TRAFFICKING WITH RESPECT TO FORCED LABOR BY ALL FORMER FORCED LABORERS AGAINST DEFENDANTS KCC AND ANSELL TVPRA, 18 U.S.C. § 1590 & 1595**

165.    Plaintiffs reallege and incorporate by reference all paragraphs previously alleged herein.

166.    As previously alleged, Plaintiffs were all subjected to forced labor at BioPro, a Brightway facility in Malaysia, that sources goods to Defendants in the United States. All Plaintiffs were recruited by third-party manpower agencies in Bangladesh, forced to pay astronomical recruitment fees, and trafficked into Malaysia. The manpower agencies had relationships with Brightway and all companies involved were aware of how the BioPro factory was staffed. Once the workers arrived at BioPro, the management team kept them there through debt bondage, seizure of their passports, and restricted ability to leave the premises. The trafficked individuals immediately became trafficked and forced laborers.

167.    All the Plaintiffs were deceived by third-party manpower agencies and paid high recruitment fees to secure a job at Brightway. Some of the Plaintiffs were shown misleading marketing videos presenting clean accommodations, good food, and workers raving about Brightway. Other Plaintiffs were promised different jobs than what they encountered upon arrival; one Plaintiff was even sent to a completely different factory than what was promised. The Plaintiffs agreed to work at Brightway because they needed to financially provide for their families and themselves and were told Brightway offered a high-paying, good job. However, Brightway and the recruitment agencies forced the Plaintiffs into a system of debt bondage that made it challenging, if not impossible, for the Plaintiffs to obtain financial stability. The Brightway management team deducted funds from the Plaintiffs' salaries for minor mistakes and the canteen, further limiting their access to funds. The Plaintiffs were also physically isolated and unable to access resources because Brightway seized their passports upon arrival and security guards

patrolled the BioPro grounds. The Plaintiffs had no choice but to work until they could figure out how to escape.

168.    Defendants are in contractual relationships with Brightway and purchase a high volume of disposable gloves that are manufactured by trafficked and forced laborers in Malaysia. The success of Brightway and BioPro operations is a fundamental element of Defendants' business enterprise. Defendants publicly recognized their business relationships with Brightway following CBP's WRO against Brightway.[81] Defendants have also recognized their responsibility to assess the operations at Brightway. Ansell and KCC claim to independently evaluate Brightway through audits, but as noted by the companies themselves, these third-party audits are insufficient and inaccurate. Plaintiffs have reported that the auditors only speak with the management team and workers are not permitted to engage with the auditors. Thus, the auditors only hear about the workplace and living environment from the supervisors, who are the exact people perpetrating human rights and labor violations. Defendants have profited off trafficked and forced labor for years without engaging in a good-faith effort to ensure the safe and humane working conditions at the factories at which their goods were manufactured. It is their responsibility and duty to identify and meaningfully address these issues, as stated by their Sustainability and Modern Slavery statements, and they failed to do so.

169.    Defendants provided material support to Brightway by continuing to purchase disposable gloves from Brightway after Defendants knew or should have known about

---

[81] https://www.reuters.com/article/malaysia-brightway-orders/ansell-halts-orders-from-malaysian-glove-maker-brightway-after-us-ban-idUKL1N2TD0E1; https://www.business-humanrights.org/en/latest-news/kimberly-clarks-response-re-brightway/

the presence of trafficked and forced labor at Brightway factories. This material support kept Brightway in business without requiring them to stop their illegal use of trafficked and forced labor. Only through Defendants' financial support has Brightway been able to sustain their operations, including at BioPro, where all the Plaintiffs worked. This symbiotic relationship makes Defendants responsible for the pain, suffering, and abuse the Forced Former Laborers experienced at BioPro.

**170.**     Based on section 1595 of the TVPRA, "whoever knowingly benefits" from trafficking as defined by section 1590 is liable. As previously alleged in paragraphs 44-68, *supra*, all Defendants knowingly benefitted from the ongoing forced labor of trafficked individuals and have failed to take meaningful steps to stop profiting from forced and trafficked labor.

**171.**     As previously alleged in paragraphs 99-109, *supra*, Defendants are participants in a disposable glove supply chain "venture" that they "knew or should have known" engaged in trafficked and forced labor. As previously alleged, Defendants were aware of labor and human rights violations in their supply chains before they were forced to stop imports due to CBP's WRO. There is proof that KCC has known of violations since 2019, and Ansell has most likely known since at least 2020. Notably, Defendants KCC and Ansell knew of the violations before CBP issued a WRO against Brightway in 2021, and Defendants failed to address the violations prior to the governmental intervention. Defendants most likely would have continued to use trafficked and forced labor if CBP has not issued the WRO and prevented Defendants from importing goods manufactured by Brightway.

**172.**     Defendants have created and maintained an organized system that depends upon trafficked and forced labor. The system enables Defendants to obtain a massive volume of disposable gloves at a very low price, which they can then sell at a high price in the United States. Defendants are responsible for creating the system, which has caused Former Forced Laborers to sustain physical and mental abuse, pain and suffering, extreme and severe mental anguish, and emotional distress. The Former Forced Laborers are thereby entitled to compensatory and punitive damages in amounts to be proven at trial.

**173.**     Defendants are key members of the disposable glove supply chain venture and are liable for the injuries caused to the Plaintiffs by the venture's forced labor system. Further, Defendants are all jointly liable and severally liable for the injuries caused to Plaintiffs by Defendants' joint actions and participation in their respective supply chain ventures. Defendants opted into contractual relationships with Brightway and ignored the many labor and human rights violations at Brightway's facilities. Defendants financially benefitted from the inhumane operations at Brightway, and as massive corporations, that was the factor that mattered most.

## COUNT III

### UNJUST ENRICHMENT BY ALL PLAINTIFFS AGAINST DEFENDANTS KCC AND ANSELL

**110.**     Plaintiffs reallege and incorporate by reference all paragraphs previously alleged herein.

**111.**     To the detriment of Plaintiffs and Class Members, Defendants have been and continue to be unjustly enriched as a result of the wrongful conduct alleged herein. Defendants are, and have been for years, purchasing cheap disposable gloves

manufactured by trafficked and forced laborers at Brightway facilities in Malaysia. Defendants are paying prices for disposable gloves that reflect the fact that the gloves are manufactured by forced laborers through systems of abuse. Defendants have unjustly benefited by buying disposable gloves at low prices that would not have been possible absent the wrongful conduct. Between the parties, it would be unjust for Defendants to retain the benefits attained by their wrongful actions at the expense of Plaintiffs and Class Members who were forced to work in inhumane conditions.

**112.**    Accordingly, Plaintiffs and Class Members seek full restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the wrongful conduct alleged therein.

**113.**    Defendants KCC and Ansell, as key members and participants in their respective disposable glove supply chain ventures, have been unjustly enriched by the venture's forced labor system. Further, Defendants are jointly and severally liable for the injuries caused to Plaintiffs by Defendants' joint actions and participation in the industry that depends upon forced and trafficked labor in the relevant supply chain.

<u>**COUNT IV**</u>

**NEGLIGENT SUPERVISION BY ALL PLAINTIFFS
AGAINST DEFENDANTS KCC AND ANSELL**

**114.**    Plaintiffs reallege and incorporate by reference all paragraphs previously alleged herein.

**115.**    When engaging in the wrongful conduct herein, Defendants had influence and control over Brightway. Defendants published Sustainability and Modern Slavery reports that include assertions that they could, and would, control the workplace environment at Brightway facilities. The reports also include standards that Brightway and its employees

were supposedly required to follow, but Defendants failed to ensure Brightway actors did so.

116.    Defendants knew or reasonably should have known that trafficked and forced labor was present in Brightway facilities that manufactured the gloves they purchased. Defendants knew or reasonably should have known that Plaintiffs would suffer injuries as alleged herein if forced into the system of abuse created by Defendants.

117.    Defendants had the authority to supervise, prohibit, control, and/or regulate the operations at Brightway and specifically, the BioPro facility. Defendants KCC and Ansell boast of their ability to change conduct within their supply chain, with respect to trafficked and forced labor, to prevent the acts described herein from occurring. Defendants also had the ability to cease business relations with Brightway before CBP issued a WRO against Brightway but chose not to.

118.    Defendants knew or reasonably should have known that unless they intervened to protect Plaintiffs and properly supervisor, prohibit, control, and/or regulate the conduct described therein, Plaintiffs would suffer the injuries alleged herein.

119.    Defendants failed to exercise due care by failing to supervise, prohibit, control, or regulate their employees and/or agents, and failed to make appropriate investigations into the possible negative impact on Plaintiffs and others similarly situated who were forced to work at Brightway. As a direct and proximate result of Defendants' negligent supervision, Plaintiffs have suffered and continue to suffer injuries entitling them to damages in amounts to be ascertained at trial.

120.    Defendants KCC and Ansell, as key members and participants in their respective disposable glove supply chain ventures, are liable for injuries caused to the Plaintiffs by

the venture's forced labor system. Further, Defendants are jointly and severally liable for the injuries caused to Plaintiffs by Defendants' joint actions and participation in the plans and programs that depend upon forced or trafficked labor in the disposable glove supply chain.

## **COUNT V**

### **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS BY ALL PLAINTIFFS AGAINST DEFENDANTS KCC AND ANSELL**

**121.**   Plaintiffs reallege and incorporate by reference all paragraphs previously alleged herein.

**122.**   By continuously and intentionally participating in a venture that relies upon using Plaintiffs and members of the class as trafficked and forced laborers to increase their profits, Defendants engaged in outrageous conduct which went beyond all bounds of decency.

**123.**   By supporting and enabling a system that relies on trafficked and forced laborers for higher profits, Defendants committed acts described herein which were intended to cause Plaintiffs to suffer severe emotional distress. In the alternative, Defendants engaged in the conduct with reckless disregard of the probability of causing Plaintiffs to suffer severe emotional distress. Plaintiffs were present at the time the outrageous conduct occurred, and the Defendants knew that Plaintiffs were present.

**124.**   The outrageous conduct of Defendants was the cause of severe emotional distress and physical damage suffered by the Plaintiffs.

**125.**   As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered damages in an amount to be ascertained at trial.

126.   Defendants KCC and Ansell, as key members of and participants in the disposable glove supply chain venture, are liable for the injuries caused to the Plaintiffs by the venture's forced labor system. Further, Defendants are all jointly and severally liable for the injuries caused to Plaintiffs by Defendants' joint actions and participation in the plans and programs that depend upon forced or trafficked labor in the disposable glove supply chain.

## VI.   DEMAND FOR A JURY TRIAL

VII.   Plaintiffs demand a trial by jury on all issues so triable.

## VIII.   PRAYER FOR RELIEF

IX.   WHEREFORE, Plaintiffs pray this Court will enter an order:

    a.   Entering judgement in favor of each of the Plaintiffs on all counts of the Complaint;

    b.   Awarding each of the Plaintiffs monetary damages, subject to proof and in an amount to be determined at trial, including but not limited to fees and costs paid, debts incurred, and wages promised but not paid;

    c.   Awarding each of the Plaintiffs consequential damages, including but not limited to the loss of assets and of business opportunities as a result of Defendants' illegal conduct;

    d.   Awarding each of the Plaintiffs damages for the mental anguish and pain and suffering Plaintiffs experienced as a result of being trafficked and forced to labor against their will;

    e.   Awarding each of the Plaintiffs punitive and exemplary damages;

f.   Awarding Plaintiffs any and all other damages allowed by law according to proof

to be determined at time of trial in this matter;

g.   Awarding Plaintiffs reasonable attorneys' fees and costs;

h.   Awarding all Plaintiffs injunctive relief, disgorgement of all profits resulting from

these unfair business practices alleged herein such that restitution is made to the

general public;

i.   Awarding class-wide relief based on the award to the individual Plaintiffs; and

j.   Awarding such relief as the Court deems just and equitable.

Respectfully submitted this 9th day of August 2022,

/s/ *Terrence P. Collingsworth*
Terrence P. Collingsworth
Executive Director
INTERNATIONAL RIGHTS ADVOCATES
621 Maryland Ave. NE Washington, D.C. 20002
202-543-5811
tc@iradvocates.org
Attorneys for Plaintiffs