## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MOHAMMED FORHAD MIA, *et al.*,

        *Plaintiffs,*

  v.

KIMBERLY-CLARK CORP., *et al.*,

        *Defendants.*

Civil Action No. 1:22-cv-02353 (CJN)

## <u>MEMORANDUM OPINION</u>

Plaintiffs are thirteen individuals who allege they were trafficked from Bangladesh to Malaysia and forced to work at a Malaysian glove factory that sold its products to two American retailers. Seeking to represent a class of similarly situated laborers, plaintiffs sue both retailers under the civil remedy provision of the Trafficking Victims Protection and Reauthorization Act (TVPRA), 18 U.S.C. § 1595(a), which provides a cause of action to any victim of a violation of the TVPRA against any entity that knowingly benefitted from participating in a venture that it knew or should have known violated the TVPRA. In addition, plaintiffs assert several common law claims against the retailers. The retailers move to dismiss. The Court will grant the motion.

### I.    Background

Defendant Kimberly-Clark Corporation is an American personal care company that produces sanitary paper products like toilet paper and diapers. ECF No. 20 (Compl.) ¶ 30. Defendant Ansell Healthcare Products LLC is the U.S. subsidiary of one of the world's largest distributors of disposable industrial and medical gloves. *Id.* ¶ 29. For many years, Kimberly-Clark and Ansell purchased latex gloves from Brightway, a disposable glove manufacturer based in Malaysia, and sold the imported gloves on the U.S. market. *Id.* ¶ 1.

On December 20, 2021, U.S. Customs and Border Protection issued a Withhold Release Order (WRO) against Brightway under Section 307 of the Tariff Act of 1930, which prohibits importing any product manufactured with forced labor. *Id.* ¶¶ 33, 36 (citing 19 U.S.C. § 1307). CBP stated that it had identified "information that reasonably indicates the use of forced labor in [Brightway's] manufacturing operations" and directed "[CBP] personnel at all U.S. ports of entry [to] detain disposable gloves produced in Malaysia by Brightway." U.S. Customs and Border Protection, *CBP issues Withhold Release Order on Brightway Group* (Dec. 20, 2021); *see also* Compl. ¶ 34 n.21. Kimberly-Clark and Ansell subsequently "stopped purchasing gloves from Brightway."[1] Compl. ¶ 48.

In the wake of the Brightway WRO, plaintiffs—thirteen individuals who allege they were trafficked from Bangladesh to Malaysia in 2017 and 2018 and forced to manufacture disposable gloves at a Brightway subsidiary called BioPro—initiated this putative class action against Kimberly-Clark and Ansell. *Id.* ¶¶ 2, 23, 48. Plaintiffs' complaint describes horrific mistreatment, first at the hands of Bangladeshi "manpower agencies" to whom plaintiffs paid high "recruitment fees" in exchange for the promise of high-paying jobs in Malaysia, and then at the BioPro factory itself. *Id.* ¶¶ 69–93. Plaintiffs allege enduring there the kind of unlawful and inhumane working conditions that prompted the WRO, including 12-hour workdays without protective equipment, delayed or withheld compensation, physical and verbal abuse, limited access to food and water, unsanitary housing, passport confiscation, and confinement to the factory premises. *Id.* Plaintiffs no longer work at BioPro, but seek damages for the injuries that they and all those similarly situated

---

[1] Plaintiffs allege that, despite ceasing to import Brightway's gloves, neither Kimberly-Clark nor Ansell has "ended its business relationship with Brightway." Compl. ¶ 107. But plaintiffs do not explain what that alleged relationship entails, if not actual business dealings like purchases.

to them suffered or are suffering as a result of their employment there.[2]  *Id.* ¶ 23 (describing plaintiffs as "Former Forced Laborers" seeking relief on behalf of "[a]ll [similarly situated] current or former forced laborers").

Plaintiffs do not allege that Kimberly-Clark and Ansell, the only defendants in this case, ever trafficked them or subjected them to forced labor in violation of the *criminal* provisions of the Trafficking Victims Protection Reauthorization Act (TVPRA).  *See* 18 U.S.C. § 1590 (ban on trafficking); *id.* § 1589 (ban on forced labor).  Instead, plaintiffs allege that "[b]ecause [Kimberly-Clark] and Ansell were both contractually acquiring Brightway's gloves during the times Plaintiffs were injured," they can be held vicariously liable for plaintiffs' injuries under the *civil* remedy provision of the TVPRA.  Compl. ¶ 99; *see also id.* ¶ 173.  That provision permits victims to recover against "whoever knowingly benefits" from "participation in a venture which that person knew or should have known has engaged in an act in violation of the [TVPRA]"—including, as alleged here, human trafficking or forced labor.  18 U.S.C. § 1595(a); *see* Compl. ¶¶ 94–173 (alleging underlying violations of TVPRA §§ 1589–90).  Plaintiffs also claim that Kimberly-Clark and Ansell's "contractual supplier-buyer relationship[s]" with Brightway permit their liability under common law theories of unjust enrichment, negligent supervision, and intentional infliction of emotional distress.  Compl. ¶¶ 101, 114–30.

In support of their TVPRA and common law claims, plaintiffs make various allegations about the nature of Kimberly-Clark and Ansell's relationship with Brightway and what the retailers knew about Brightway's internal operations.  For instance, plaintiffs contend that Kimberly-Clark

---

[2] In their complaint, plaintiffs also sought unspecified "injunctive relief."  Compl. ¶ 132(h).  But in opposing defendants' motion to dismiss, plaintiffs' "concede" that they lack "standing to obtain injunctive relief" under *Doe 1 v. Apple Inc.*, 96 F.4th 403 (D.C. Cir. 2024).  ECF No. 26 (Opp.) at 3 n.1.

and Ansell had "sufficient control [over Brightway] to require changes in [its] labor practice[s]," given their "massive [Brightway] purchase agreements"—which plaintiffs allege afforded defendants "significant financial leverage"—and their post-WRO statements that they would "re-evaluate our relationship with Brightway" and "s[eek] to work with Brightway to address the violations" that had come to light. *Id.* ¶¶ 101–02, 107.  Plaintiffs further allege that Kimberly-Clark and Ansell were "intimately aware of the operations at Brightway" because they conducted "third-party audits" of its factories—albeit assertedly "superficial" ones—and received "numerous and detailed reports" from a "Migrant Worker Specialist" chronicling "systematic trafficking and forced labor in their supply chains, particularly at Brightway."[3]  *Id.* ¶¶ 40, 47, 49, 51, 104, 168. Finally, plaintiffs contend that Kimberly-Clark in particular had a "common purpose and shared interest with Brightway" because it "provid[ed] Brightway with a significant amount of [its] machinery and molds used in manufacturing latex gloves," and formerly "owned one of Brightway's factories and sold it to Brightway at a price that allowed [it] to continue to manufacture low-cost latex gloves."[4]  *Id.* ¶ 103.

After plaintiffs filed suit, they moved the Court to recuse itself on the basis that their attorney had previously argued (unsuccessfully) that the Court should have recused itself in an unrelated case arising under the TVPRA, *Doe I v. Apple Inc.*, 2021 WL 5774224, (D.D.C. 2021). *See* ECF No. 5; *see also* Order, *Doe 1 v. Apple Inc.*, No. 21-7135 (D.C. Cir. June 28, 2022).  The Court subsequently stayed this case pending the Court of Appeals' merits decision in *Doe 1 v. Apple*, and unstayed it in April 2024 once the mandate in that case issued.  *See* Min. Orders of

---

[3] Plaintiffs do not specify the affiliation of this "specialist" and identify him only by his first and last name, Andy Hall.  Compl. ¶ 40.

[4] Plaintiffs do not allege that Kimberly-Clark sold Brightway the BioPro factory specifically.  Compl. ¶ 103.

Nov. 28, 2022 and April 15, 2024.  Plaintiffs then amended their complaint to include all of the

allegations discussed above, *see* Compl.; Kimberly-Clark and Ansell moved to dismiss under Rule

12(b)(6), *see* ECF No. 22 (Mot.); and the Court denied plaintiffs' recusal motion (which defendants

had opposed).  *See* ECF Nos. 10, 25.

## II.    Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to state a claim to relief that is plausible on its face.  A claim has facial plausibility

when the plaintiff pleads factual content that allows the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(quotation marks and citations omitted).  "Threadbare recitals of the elements of a cause of action,

supported by mere conclusory statements, do not suffice."  *Id.*

## III.    Analysis

### A.    TVPRA Claims

"The TVPRA creates a civil remedy against any person who 'knowingly benefits . . . from

participation in a venture' that violates federal slavery and human trafficking laws."  *Doe 1 v.*

*Apple Inc.*, 96 F.4th 403, 406 (D.C. Cir. 2024) (quoting 18 U.S.C. § 1595(a)) (citing *id.* §§ 1589–

90).  Defendants argue that plaintiffs' TVPRA claims fail because plaintiffs do not allege sufficient

facts to demonstrate that Kimberly-Clark and Ansell participated in ventures with Brightway or

that, if they did, either company knew or should have known that the venture violated the TVPRA.

Mot. at 10.  Defendants also argue that plaintiffs' TVPRA claims fail because the TVPRA's civil

remedy provision does not apply extraterritorially and the violations alleged here occurred in Bangladesh and Malaysia.[5]  *Id.* at 28–32.

### 1.    Participation in a Venture

"[P]articipation in a venture" carries its "ordinary meaning": "taking part or sharing in an enterprise or undertaking that involves danger, uncertainty, or risk, and potential gain."  *Apple*, 96 F.4th at 415.  "Although a formal business relationship is not necessary to be a participant in a venture, something more than engaging in an ordinary buyer-seller transaction is required"—like a "common purpose, shared profits and risk, or control" by the defendant of the relevant entity. *Id.* at 415–16.  "[P]urchasing a commodity, without more, is not 'participation in a venture' with the seller."  *Id.* at 416.

In *Apple*, for example, the Court of Appeals held that American technology companies did not "participate in a venture" with cobalt suppliers alleged to have facilitated forced labor by buying cobalt from them in "an arms-length transaction."  *Id.* at 415.  The Court rejected the notion that the tech companies were "different from ordinary buyers because they 'have a contractual right to inspect and . . . control' the cobalt suppliers," such as by allegedly "perform[ing] a 'third party audit' of [a supplier] after public pressure about the use of forced labor" or "requir[ing]" suppliers to join an industry-led monitoring program.  *Id.* at 416.  The Court also rejected the notion that "the possibility of commercial pressure" on the suppliers was "enough to establish a 'venture' between a buyer and seller" when the "only control apparent in the complaint" was the companies' "right to stop purchasing cobalt."  *Id.*  For "allegations of market power [to] show

---

[5] Defendants do not contest that plaintiffs adequately allege underlying violations of the TVPRA—i.e., defendants appear to concede that plaintiffs have pleaded sufficient facts to demonstrate that they were subjected to forced labor under 18 U.S.C. § 1589(a) and trafficked under 18 U.S.C. § 1590(a).  *See* Opp. at 5 n.3.

participation in a venture," the Court explained, plaintiffs would at a minimum need to allege specific facts about the number of market participants, "the relative power of each," and "how much of the suppliers' [products] w[ere] purchased by the [defendants] as opposed to other . . . global buyers." *Id.*

For precisely the reasons outlined in *Apple*, plaintiffs have not pleaded sufficient facts to demonstrate that Kimberly-Clark or Ansell "participated in a venture" with Brightway. Plaintiffs' "venture" allegations hinge on defendants' assertedly "massive purchase agreements" with Brightway, through which they repeatedly "contractually acquir[ed]" gloves allegedly produced with forced labor. Compl. ¶¶ 29–30, 99, 107. But *Apple* was clear: no matter how valuable or longstanding, an agreement to "[p]urchase a commodity, without more, is not 'participation in a venture' with the seller." 96 F.4th at 416; *see also id.* at 414 (technology companies were "major purchasers of cobalt").

And plaintiffs have not pointed to anything "more" that suffices to transform defendants' contracts with Brightway into a venture. As in *Apple*, plaintiffs allege that defendants' "substantial business agreements with Brightway" gave them "significant financial leverage over Brightway such that they ha[d] sufficient control to require changes" in its labor practices. Compl. ¶¶ 101, 107. But the examples of "control" that plaintiffs offer—defendants' supposedly mandating that Brightway participate in remediation programs, "suspend[ing] . . . orders from Brightway," and stating they would "reevaluate [their] relationship[s]" with it—are nothing more than the "right to stop purchasing" that *Apple* expressly held did not "give[] buyers control over their suppliers or result[] in the sharing of risks and rewards." *Id.* ¶¶ 101–02; *Apple*, 96 F.4th at 416. Plaintiffs have not made the kind of "specific allegations" that the Court of Appeals held would be necessary for market power alone to establish control: "purchasing an *unspecified* amount of [latex gloves] from

[Brightway]," which is all plaintiffs allege here, does not "plausibly demonstrate[] participation in a 'venture.'"  *Apple*, 96 F.4th at 416 (deeming insufficient plaintiffs' allegations that the technology companies, with others, "control at least 80-85 percent of the DRC cobalt supply chain").

Plaintiffs' assertion that Kimberly-Clark and Ansell had a contractual "right to conduct audits of labor conditions at Brightway's factories" is similarly unavailing.  Compl. ¶ 104.  "A third-party investigation is not evidence of . . . control."  *Apple*, 96 F.4th at 416.  Nor can the alleged deficiency of those voluntary audits—which plaintiffs conclusorily assert was "intentional"—support the conclusion that defendants had a "common purpose" with Brightway because they "worked to cover up [its] forced labor violations to allow [defendants] to continue realizing excess profits."  ECF No. 26 (Opp.) at 14.

Plaintiffs also make two allegations specific to Kimberly-Clark that they contend "reinforce" its "common purpose and shared interest" with Brightway: namely, that it provided Brightway "with a significant amount of [its] machinery and molds used in manufacturing latex gloves" and once sold a glove factory to Brightway "at a price that allowed [it] to continue to manufacture low-cost latex gloves."  Compl. ¶ 103; Opp. at 15.  But those allegations do not demonstrate "the type of direct and continuous relationship that existed between the parties in [*G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 560 (7th Cir. 2023)]," the case that the Court of Appeals has pointed to as exemplifying "a plausible TVPRA violation based on close cooperation between business entities."  *Apple*, 96 F.4th at 415–16.

In *Salesforce*, the defendant software company "provided direct support, specific business advice, and productivity enhancing software to Backpage.com, which hosted prostitution ads, thereby 'facilitat[ing] the growth of . . . a business . . . whose business model was built upon

systematic and widespread violations of [federal sex trafficking law].'" *Id.* at 415 (quoting *Salesforce*, 76 F.4th at 560–61). By contrast, Kimberly-Clark is alleged only to have provided Brightway with off-the-shelf materials and machinery—a far cry from Salesforce's "tailored," "active, [and] ongoing support" of Backpage, which encompassed "custom-built software" and consultations with its CEO. *Salesforce*, 76 F.4th at 548, 560–63 ("We assume that 'participation' requires more than providing off-the-shelf software . . . ."). Nor, unlike in *Salesforce*, have plaintiffs alleged that Kimberly-Clark's actions specifically "increase[d] the [labor violations] conducted" at BioPro; indeed, they have not alleged that the supplies Kimberly-Clark furnished had anything at all to do with BioPro. *Id.* at 560. While the level of intertwinement between Salesforce and Backpage suggested that the entities had a "'business relationship' [that] was more than just a purchasing agreement," *Apple*, 96 F.4th at 415, the fact that a buyer of manufactured goods conducted an additional arms-length transaction to ensure that its supplier had the materials needed to produce those goods suggests nothing of the sort. In short, this case is like *Apple* and unlike *Salesforce*; the slight twist that Kimberly-Clark allegedly provided Brightway with materials lacking any asserted connection to Brightway's unlawful operations at BioPro is insufficient to change that conclusion.

## 2. Knowledge

To state a claim under the TVPRA's civil remedy provision, a plaintiff must also plausibly allege that the defendant "knew or should have known" that the venture in which it participated involved a TVPRA violation. 18 U.S.C. § 1595(a). As numerous courts have held, it is not enough to allege that a defendant knew or should have known of labor abuses in a particular country or industry "*generally.*" *Ratha v. Phatthana Seafood Co.*, 35 F.4th 1159, 1177 (9th Cir. 2022); *see also, e.g.*, *Doe (L.M.) v. 42 Hotel Raleigh, LLC*, 717 F. Supp. 3d 464, 473 (E.D.N.C. 2024)

("Courts routinely have held, even at the pleading stage, that general allegations of sex trafficking in the hotel industry, and at other hotels, do not impute constructive knowledge as required here."). Instead, the relevant question is whether Kimberly-Clark and Ansell "knew or should have known of the specifically alleged TVPRA violations at the [BioPro] factory between [2017] and [2021]." *Ratha*, 35 F.4th at 1177 (holding that "[s]weeping generalities about the Thai shrimp industry" were "too attenuated to support an inference" that the defendant had actual or constructive knowledge of the particular labor abuses that plaintiffs alleged). Plaintiffs object that this standard somehow requires actual knowledge and thus "would read the 'should have known' language out of the statute." Opp. at 6. But either actual or constructive knowledge suffices; it just must pertain to the alleged venture rather than to an industry or country writ large—as the text of the TVPRA requires. *See S.J. v. Choice Hotels Int'l, Inc.*, 473 F. Supp. 3d 147, 154 (E.D.N.Y. 2020) ("The statutory text speaks in singular terms – "participation in *a* venture which that person . . . should have known *has* engaged in *an* act in violation of this chapter.") (quoting 18 U.S.C. § 1595(a)).

Plaintiffs have not pleaded sufficient facts to demonstrate that defendants had the requisite knowledge here. To start, many of plaintiffs' allegations focus on what Kimberly-Clark and Ansell supposedly knew about "the existence and perpetration of forced labor in Malaysian glove manufacturing firms" generally. Compl. ¶ 1 (describing other WROs "against glove makers in Malaysia"); *see also, e.g.*, *id.* ¶ 40 (alleging that "the media has documented the human rights violations on which CBP's WROs and Findings are based"); *id.* ¶ 50 (attesting that Ansell's 2021 Sustainability Report "recognize[d] the presence of trafficking and forced labor in the glove manufacturing industry"). But even if defendants were aware that other Malaysian glove makers had been accused of labor abuses, that says nothing about what they knew or should have known about Brightway or BioPro in particular—which is the only pertinent inquiry. Nor can plaintiffs

shore up their assertions of general knowledge by citing defendants' statements regarding potential labor issues in "their respective supply chains." *Id.* ¶ 44. Those statements remain "too attenuated" from the events at Brightway (not to mention BioPro) to support a plausible conclusion that defendants had actual or constructive knowledge of any abuses occurring there specifically. *Ratha*, 35 F.4th at 1177–78 (requiring "company-specific information" in order to infer knowledge of labor abuses); *cf. A.B. v. Marriott Int'l, Inc.*, 455 F. Supp. 3d 171, 193 (E.D. Pa. 2020) (Marriott "knew or should have known of a sex trafficking venture" at three airport hotels where rooms were "littered with multiple broken objects, used condoms, and other sex paraphernalia which would have been noticed by staff").

Beyond their country- and industry-wide allegations, plaintiffs also allege that defendants knew or should have known of forced labor and trafficking at Brightway based on (1) their third-party audits of its facilities and (2) communications they apparently received from a "migrant worker specialist" named Andy Hall. *See* Compl. ¶¶ 40, 49, 51–52, 59, 104, 110. As for the third-party audits, plaintiffs point to different audit reports for each defendant. Regarding Kimberly-Clark, plaintiffs note that a 2019 Kimberly-Clark report indicated that Kimberly-Clark had completed third-party audits at 150 of its suppliers and determined that "84% of its audited suppliers demonstrated compliance" with its "company compliance requirements." Compl. ¶ 51. And regarding Ansell, plaintiffs quote from a press report issued after the WRO, which characterized Ansell as stating that "it was aware of non-compliance at the Brightway facilities through its third-party audits and continues to work closely with the glove maker on remediation plans." *Id.* ¶¶ 49, 59 & n.60.

Neither defendant's statement plausibly demonstrates its actual or constructive knowledge of forced labor or human tracking at BioPro. That Kimberly-Clark determined in 2019 that 16%

of its audited suppliers were not complying with *its own* unspecified compliance requirements does not imply that Brightway or BioPro were in that 16% (or were even audited), or that the type of noncompliance Kimberly-Clark found amounted to forced labor or human trafficking as defined in the TVPRA. *Cf. Doe I v. Apple Inc.*, 2021 WL 5774224, at *13 (D.D.C. 2021), *aff'd,* 96 F.4th 403 (D.C. Cir. 2024) (holding that allegations of child labor, while "[n]o doubt [] abhorrent[,]" did not meet the statutory definition of forced labor). A similar deficiency plagues plaintiffs' allegations about Ansell's audits: the press report quotation that plaintiffs cite does not specify or even suggest that the "non-compliance" of which Ansell was "aware" involved TVPRA violations specifically.

To the contrary, another press report cited by plaintiffs explicitly states that pre-WRO audits of each Brightway facility found "no forced, bonded or involuntary prison labour," despite surfacing other "violations of global ethical standards" and of "Malaysian labour laws."[6] Mot. Ex. A at 2. Indeed, that could have been because, according to plaintiffs, "[a]ll of the Plaintiffs who were present during an audit were either told not to speak to the auditors or, if they did, only share good things about Brightway." Compl. ¶ 65. Plaintiffs do not explain how Kimberly-Clark and Ansell could have known of labor violations at Brightway through audits if it is also true that Brightway was actively concealing the true conditions at BioPro from the auditors. And to the extent that plaintiffs claim defendants *knew* their audits were deficient—an allegation that is wholly conclusory in part for the reasons discussed below—that knowledge (even if it existed)

---

[6] Plaintiffs object that defendants' "inclusion of [Exhibit A, the full press report,] to their MTD" impermissibly "attempts to dispute factual matters in the context of a Motion to Dismiss." Opp. at 5 n.2. But the press report is incorporated by reference in plaintiffs' complaint. *See* Compl. ¶ 49 & n.47. The Court may therefore consider it in full in deciding defendants' motion, including portions that plaintiffs did not expressly cite. *See Hinton v. Corrs. Corp. of Am.*, 624 F. Supp. 2d 45, 46–47 (D.D.C. 2009).

would still not reflect knowledge of any underlying abuses that the audits were supposed to, but did not, unveil.

Finally, any communications that Kimberly-Clark and Ansell received from migrant worker specialist Andy Hall do not change matters.  Plaintiffs allege that Mr. Hall "sent numerous and detailed reports to [defendants'] senior managers reporting systematic trafficking and forced labor in their supply chains, particularly at Brightway," and "also regularly informed them that their so-called audits performed by outside auditors at the Brightway facilities were not accurate due to prior notice and superficial changes made by Brightway for the purposes of misleading the auditors."  Compl. ¶ 40.  But plaintiffs do not allege *when* Mr. Hall transmitted this information to defendants, and civil liability under the TVPRA requires knowledge of wrongdoing at the particular time the defendant "benefitted . . . from participation in [the] venture"—not, for example, after the defendant has already ceased any business dealings with the alleged exploiter (as happened here in 2021).  18 U.S.C. § 1595(a); *see also Ratha*, 35 F.4th at 1179–80 (affirming summary judgment on pre-2012 TVPRA claims where plaintiffs failed to allege that defendant "knew or should have known of the alleged labor abuses" prior to that date).  And in any event, plaintiffs have not offered any specifics about the contents of Mr. Hall's reports or how they were sourced or delivered to defendants.  Absent those types of facts—which determine the utility and credibility of any documents Kimberly-Clark and Ansell received—it is merely possible and not plausible that defendants knew or should have known of TVPRA violations occurring at Brightway.[7]

---

[7] Defendants also argue that "[e]ven if Plaintiffs ha[ve] adequately alleged constructive knowledge of TVPRA violations at Brightway or BioPro facilities *generally*," they have not alleged that "Defendants knew or should have known of Plaintiffs' *particular* injuries."  Mot. at 27.  Some courts have held that to be the standard for knowledge under the TVPRA's private right of action.  *See, e.g.*, *Doe (S.M.A.) v. Salesforce, Inc.*, 2024 WL 1337370, at *14 (N.D. Tex. 2024);

3.       **Extraterritoriality**

Defendants last argue that plaintiffs' TVPRA claims "must also be dismissed because they impermissibly seek to apply the TVPRA's civil remedy provision extraterritorially," to injuries that occurred in Bangladesh and Malaysia.  Mot. at 28.  Federal laws are presumed to cover only domestic conduct; that presumption is rebutted only when a statute gives "a clear affirmative indication that it applies extraterritorially." *RJR Nabisco v. European Cmty.*, 579 U.S. 325, 335, 337 (2016).  In its decision in *Apple*, this Court explained that the TVPRA's civil remedy section lacks any such indication, and so held that plaintiffs sought an impermissibly extraterritorial application of it by suing over injuries and underlying TVPRA violations that occurred exclusively in the Democratic Republic of the Congo.[8]  2021 WL 5774224, at *14–16.  Although plaintiffs urge that the Court's decision in *Apple* was incorrect, the Court is unpersuaded.

The parties' arguments in *Apple* focused little on the text of the TVPRA's civil remedy provision itself, § 1595, which "says nothing about extraterritorial application" and "[t]hus, standing alone, [] does nothing to rebut the presumption that it applies only domestically." *Id.* at *14.  Instead, the crux of the debate was over the effect of TVPRA § 1596(a), which provides that, in certain circumstances, "the courts of the United States have extra-territorial jurisdiction over any offense (or any attempt or conspiracy to commit an offense) under section 1581, 1583, 1584,

---

*but see Salesforce*, 76 F.4th at 558 (siding "with the majority of courts" and concluding that § 1595 "does not require allegations . . . that the defendant knew or should have known of the specific victim who has brought the civil action").  The Court agrees that, if the "specific victim" standard applies, plaintiffs have not met it.  But because plaintiffs have not adequately alleged that defendants "had [actual or] constructive knowledge that a venture *generally* has violated [§] 1591," *id.*, the Court need not resolve whether more is required—a nontrivial question. *See id.* at 556–58 (analyzing it at length).

[8] When affirming this Court's *Apple* decision, the Court of Appeals did not reach the question of whether the TVPRA's civil remedy provision applies extraterritorially.  *See Apple*, 96 F.4th at 414 n.4.

1589, 1590, or 1591" of the TVPRA.  18 U.S.C. § 1596(a).  The *Apple* plaintiffs contended that,

because they—like plaintiffs here—sought "civil relief through § 1595 for violations of § 1589

and § 1590, . . . § 1596(a) allow[ed] for extraterritorial application."  *Apple*, 2021 WL 5774224, at

*14.  But the Court saw several "flaws" in that argument.  *Id.* at *15.  For one, § 1596 does not

mention § 1595's civil remedy, despite "explicitly grant[ing] extraterritorial application to many

criminal statutes"—and "when a statute provides for some extraterritorial application, the

presumption against extraterritoriality operates to limit that provision to its terms."  *Id.* (quoting

*Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 265 (2010)).  Moreover, the "text and

structure of § 1596"—which repeatedly uses the word "offense" and provides that no "*prosecution*

may be commenced" if a foreign government has already initiated one—"suggest[s] that it was

focused on criminal, not civil, applications."  *Id.* (quoting 18 U.S.C. § 1596(b)).  The Court thus

concluded that Congress's "omission of § 1595 [from § 1596(a)] was not mistaken, but was an

intentional decision not to extend extraterritorially the reach of the statute's civil component."  *Id.*

at *16.

Plaintiffs and their amici argue that this reasoning was flawed because it failed to consider

that the TVPRA's civil remedy provision "directly incorporates extraterritorial predicate crimes,"

including the predicate crimes on which plaintiffs rely in this action.  ECF No. 26-1 (Amicus Br.)

at 11; Opp. at 16.  Plaintiffs analogize § 1595 of the TVPRA to § 1962 of RICO, which criminalizes

certain conduct involving a "pattern of racketeering activity"—defined in turn as "a series of

related predicate[] [offenses] that together demonstrate the existence or threat of continued

criminal activity."  *RJR Nabisco*, 579 U.S. at 330; *see* Opp. at 18.  In *RJR Nabisco*, the Supreme

Court held that RICO § 1962 applies extraterritorially "to the extent that the predicates alleged in

a particular case themselves apply extraterritorially," making it the "rare statute that clearly

evidences extraterritorial effect despite lacking an express statement of extraterritoriality." *Id.* at 339–40.  According to plaintiffs, the TVPRA's civil liability provision is similarly unique because it is likewise "coextensive" with the predicate criminal provisions in the TVPRA, some of which apply extraterritorially.  Amicus Br. at 13; *see* 18 U.S.C. §§ 1595, 1596, 3271.  Indeed, the Fourth Circuit so concluded in *Roe v. Howard*, 917 F.3d 229, (4th Cir. 2019), holding that "*RJR Nabisco* compels the extraterritorial application of § 1595 with respect to its extraterritorial predicates." *Id.* at 243.

But as even *Howard* recognized, *RJR Nabisco* expressly rejected the extraterritorial application of RICO's *civil* remedy provision, which provides a private right of action to "[a]ny person injured in his business or property by reason of a violation of [RICO §] 1962." *RJR Nabisco*, 579 U.S. at 346 (quoting 18 U.S.C. § 1964(c)).  *RJR Nabisco* explained that "providing a civil remedy for foreign conduct creates a potential for international friction beyond that presented by merely applying U.S. substantive law to that foreign conduct," in part because "the check imposed by prosecutorial discretion" is absent.  *Id.* at 346–47.  Thus, in that context, "the need to enforce the presumption [against extraterritoriality] is at its apex." *Id.* at 348.  And after noting that nothing in the text of RICO's civil right of action "provides a clear indication that Congress intended to create a private right of action for injuries suffered outside of the United States," the Court dismissed precisely the reasoning that plaintiffs advance here—"that a private right of action must reach abroad because the underlying law governs conduct in foreign countries." *Id.* at 349–50.  That reasoning "fail[ed] to appreciate that the presumption against extraterritoriality must be applied separately to both [a criminal statute's] substantive prohibitions and its private right of action," and that "[s]omething more is needed" for a civil remedy provision to apply abroad.  *Id.* at 350.

The Fourth Circuit in *Howard* held that the "part" of *RJR Nabisco* that "declined to apply RICO's civil cause of action to foreign conduct" "depended on factors that do not apply to § 1595 of the TVPA," like the fact that it, unlike § 1595, is "not coextensive with" the substantive criminal prohibitions because its application is limited to "certain types of injuries." 917 F.3d at 243. But *RJR Nabisco* did not cite that fact as an *affirmative* reason that RICO's private right of action does not apply extraterritorially, it just noted that it "does not *indicate* extraterritoriality"—and that nothing else in the text of the civil remedy provision does either. 579 U.S. at 350. Nor did the Supreme Court doubt that, as is true of the TVPRA, some of the substantive criminal prohibitions applicable through RICO's civil right of action apply extraterritorially. It just did not find that to be "something more" warranting its extraterritorial application. *Id.* ("It is not enough to say that a private right of action must reach abroad because the underlying law governs conduct in foreign countries.").

Seeking that "something more" in the TVPRA, the *Howard* decision notes that "§ 1595 expressly and directly incorporates the TVPRA's criminal predicates, many of which manifestly apply to foreign conduct." 917 F.3d at 243. But it is not clear how that is meaningfully different from RICO § 1964, which expressly references § 1962—a criminal predicate that applies through its own predicates to foreign conduct. The Court is therefore unpersuaded by plaintiffs' arguments from *Howard*, which appears to have erroneously "reasoned that [§ 1595]'s extraterritorial effect flows directly from that of" the substantive criminal prohibitions in the TVPRA. *RJR Nabisco*, 579 U.S. at 350. Nor, given the lack of any textual indicia that § 1595 applies extraterritorially (especially the negative inference from § 1596 discussed in *Apple*), and the heightened policy concerns involved in extending civil liability abroad, does the Court find the TVPRA's asserted general "concern[] with international . . . matters" to be the kind of "context" that could warrant

the extraterritorial application of its civil remedy provision.[9]  *Howard*, 917 F.3d at 242; *RJR Nabisco*, 579 U.S. at 340.

Plaintiffs also urge that, even if the Court does not reconsider its view from *Apple* to hold that § 1595 applies extraterritorially, it should at least find that plaintiffs do not seek an improperly extraterritorial application of § 1595 here.  To determine whether a case "involves a permissible domestic application" of a statute, courts "look[] to the statute's 'focus.'"  *RJR Nabisco*, 579 U.S. at 337.  "[I]f the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory."  *Id.*  In *Apple*, the Court explained that the focus of the TVPRA's private right of action is ultimately on the underlying criminal violations and not on any benefits that accrue from them, because § 1595 "provides a civil remedy to 'a victim of a violation' of the TVPRA—it does not create a new violation merely for benefitting from other violations."  2021 WL 5774224, at *16 (quoting 19 U.S.C. § 1595(a)).  And here, as in *Apple*, the conduct relevant to that focus, i.e., the actual TVPRA violations, all occurred abroad.  *See* Compl. ¶ 6 ("All injuries Plaintiffs suffered were a result of their being trafficked [from Bangladesh] and subjected to harsh conditions performing forced labor [in Malaysia].").

---

[9] The Court is aware that in *Abernathy v. Carlyle Group, Inc.*, 2024 WL 5331993, (D.D.C. 2024), another court in this district followed essentially the reasoning of *Howard* to hold that § 1595 "applies extraterritorially to alleged violations by U.S. government contractors" because it "incorporates offenses that themselves have extraterritorial application."  *Id.* at *9.  *Abernathy* also (like *Howard*) relied on the legislative history of the TVPRA to opine that the Act's "express objective" "was to reach certain types of conduct and the resulting harm both at home and abroad."  *Id.* at *9.  To the extent that *Abernathy* would have reached the same result in a case against a private corporation—not a certainty because the *Abernathy* court found it "of key importance" that the suit before it "involve[d] what is essentially an extension of the United States government abroad," *id.* at *13—the Court finds *Abernathy*'s logic unpersuasive for the reasons already discussed.

Plaintiffs and their amici resist this conclusion on the basis that the substantive criminal violations alleged here (and in *Apple*) *include* the act of benefitting from forced labor, which defendants purportedly did in the United States. Opp. at 22 (citing 18 U.S.C. § 1589(b)). But as the Court of Appeals explained in a similar context, conduct "constitutes the 'core' of [a] claim" only when it "is itself wrongful—as opposed to wrongful based only on other conduct." *Rodriguez v. Pan Am. Health Org.*, 29 F.4th 706, 716 (D.C. Cir. 2022) (gravamen of TVPRA action was domestic for FSIA immunity purposes where defendant was alleged to have committed a financial crime in the United States and thus the "'financial benefit' that violate[d] § 1589(b) [wa]s itself 'wrongful conduct'"). Here, plaintiffs have not claimed that defendants committed any affirmative financial wrongdoing, but only that any benefits received from their dealings with Brightway were wrongful based on its alleged labor abuses. Again, those abuses occurred entirely abroad, making plaintiffs' claims impermissibly extraterritorial.

B.    **Common Law Claims**

In addition to their TVPRA claims, plaintiffs also assert three common law claims—for unjust enrichment, negligent supervision, and intentional infliction of emotional distress. Compl. ¶¶ 114–30. But those claims are all premised on the notion that Kimberly-Clark and Ansell each "were in a venture with" Brightway, making them "sufficiently connected to [its] acts to be jointly and severally liable for the common law tort[s]." *Apple*, 96 F.4th at 416; *see* Compl. ¶ 117 (alleging that defendants, as "participants in their respective disposable glove supply chain ventures, have been unjustly enriched by the venture's forced labor system"); *id.* ¶ 124 ("Defendants are jointly and severally liable for the injuries caused to Plaintiffs by Defendants' [negligent supervision of] and participation in the . . . disposable glove supply chain"); *id.* ¶ 126 ("By . . . participating in a venture that relies upon using Plaintiffs . . . as trafficked and forced

laborers . . . , Defendants engaged in outrageous conduct which went beyond all bounds of decency."). Because plaintiffs have not adequately alleged "participation in a venture" for the reasons discussed above, their common law claims fail. *Apple*, 96 F.4th at 416–17 (affirming dismissal of common law claims on this basis).

But these common law claims would also fail even if they did not depend on the existence of a venture or if plaintiffs had adequately alleged that such venture existed here. Beginning with unjust enrichment, "Plaintiffs must allege that they conferred a benefit on Defendants, that Defendants retained that benefit, and that allowing Defendants to retain that benefit would be unjust."[10] *Apple*, 2021 WL 5774224, at *17. Yet, there is "no authority demonstrating that benefits received from third-parties can be the proper subject of an unjust enrichment claim," *Aston v. Johnson & Johnson*, 248 F. Supp. 3d 43, 56 (D.D.C. 2017), and plaintiffs here allege only that they conferred a benefit on Brightway which then conferred a benefit on defendants. *See* Compl. ¶ 115. "An unjust enrichment claim cannot survive such a tangential chain." *Apple*, 2021 WL 5774224, at *17.

Likewise with negligent supervision, which requires "that the employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with actual or constructive knowledge, failed to adequately supervise the employee." *Phelan v. City of Mount Rainier*, 805 A.2d 930, 937–38 (D.C. 2002) (quotation marks omitted). Again, plaintiffs have not alleged that Kimberly-Clark or Ansell "employed" anyone at Brightway or BioPro, and "[a] defendant cannot negligently fail to supervise someone it has no legal obligation to supervise." *Apple*, 2021 WL 5774224, at *17 & n.9. The mere allegation that

---

[10] The parties "concur" that, "at this stage of proceedings, the law of the District of Columbia should be applied to [plaintiffs'] common law claims." Opp. at 23 n.5; *see also* Mot. at 36–37 n.15.

Kimberly-Clark and Ansell had the power to audit Brightway facilities or could influence Brightway by opting not to buy its gloves is insufficient. *See id.* (explaining that duty and "day-to-day" control are needed for a negligent supervision claim) (citing *Doe I v. Wal-Mart Stores, Inc.*, 572 F.3d 677, 684 (9th Cir. 2009)).

Finally, a claim for intentional infliction of emotional distress requires, among other elements, "extreme and outrageous conduct on the part of the defendant." *Purcell v. Thomas*, 928 A.2d 699, 711 (D.C. 2007). But "there is nothing 'extreme and outrageous' about Defendants' conduct: purchasing a commodity from a supplier." *Apple*, 2021 WL 5774224, at *17. For all the reasons already discussed, plaintiffs have not pointed to any fact that plausibly suggests Kimberly-Clark or Ansell engaged in acts that went "beyond all possible bounds of decency," so as "to be regarded as atrocious, and utterly intolerable in a civilized society." *Purcell*, 928 A.2d at 711.

## IV.    Conclusion

For the foregoing reasons, the Court will grant Kimberly-Clark and Ansell's Motion to Dismiss, ECF No. 22.

An Order will accompany this Opinion.


DATE: March 10, 2025

_____
CARL J. NICHOLS
United States District Judge